MORRIS LIPSITZ AND HELEN LIPSITZ, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MORRIS LIPSITZ, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 24799, 24800. Promulgated March 18, 1954.

918

*Llewellyn A. Luce, Esq.*, and *Walter H. Maloney, Esq.*, for the petitioners.

*J. Nelson Anderson, Esq.*, for the respondent.

930

OPINION.

RAUM, *Judge:* The Commissioner determined the deficiencies in controversy by using the increase in net worth and expenditures method of computing net income. Under that method the increase in net worth (without including any unrealized gains) during the taxable year, after making appropriate adjustment for such items as the nontaxable portions of capital gain, tax-free receipts (e. g., gifts and inheritances), depreciation, and unallowable deductions (e. g., living expenses and Federal income taxes paid), may be taken as evidence of a taxpayer's net income for such year.

The net worth method is not a system of accounting; it is not a substitute for either the cash or the accrual basis of accounting or any other recognized method of keeping books. When correctly applied to the facts of a particular situation it is merely evidence of income. And when the increase in net worth is greater than that reported on a taxpayer's returns or is inconsistent with such books or records as are maintained by him, the net worth method is cogent evidence that there is unreported income or that the books and records are inadequate, inaccurate, or false. It is not correct to say that the use of the net worth method is forbidden where the taxpayer presents books from which income can be computed, for the net worth method itself may provide strong evidence that the books are unreliable. Moreover, such fragmentary books and records as were maintained by petitioners herein were wholly inadequate and we are fully satisfied that the Commissioner was justified in resorting to the net worth method. We cannot agree with petitioners that the use of the net worth method is inappropriate for some of the years in controversy.

The case was tried before us on the net worth theory, each side attempting to support its version of the petitioners' net worth statement running from December 31, 1937, through December 31, 1945. There was agreement between the parties as to some of the items on the statement and the trial was concerned in large part with evidence as

to the disputed items. We have followed the net worth method here, and our findings as to the petitioners' net income for each of the years 1938–1945 are the result of applying that method to agreed facts and facts as we have found them, in much the same manner as the parties themselves have applied it to the facts asserted by each of them.[1] Moreover, since petitioners had executed waivers only for the years 1943, 1944, and 1945, each of the other years in controversy is barred by limitations unless at least part of the deficiency for each such year is due to fraud; and the burden of proving fraud is upon the Government. Accordingly, our approval of deficiencies, as well as additions for fraud, for the years in question is predicated upon our conclusion that such burden has been met.

Petitioner Morris Lipsitz was engaged in a large number of transactions. Although his counsel made conscientious efforts to present a coherent picture of Lipsitz' affairs, the record before us is a confused jungle of evidence. Lipsitz was the principal witness, and much of the confusion is attributable to him. Notwithstanding his lack of formal education, he is an alert, shrewd, and perceptive person. He

---

[1] Petitioners contend on brief that the Commissioner has disregarded and ignored the assets of petitioner Helen Lipsitz in the December 31, 1937, net worth statement; and they also argue that for some of the years here involved the deficiencies are asserted against petitioner Morris Lipsitz alone but are based in part upon increases in net worth of assets belonging to petitioner Helen Lipsitz. We think these contentions are without merit in the circumstances of this case. For some of the years involved petitioner Morris Lipsitz filed separate returns in his own name; for the other years he filed joint returns with his wife, Helen. The deficiencies determined by the Commissioner are geared to the returns; they were proposed against petitioner Morris Lipsitz alone for the years in which he filed separate returns and against both spouses for the other years. The net worth statements are based on the joint assets of Morris and Helen Lipsitz. Throughout the trial of this case it was assumed that the assets of both were involved and that the increases in net worth based upon assets of both petitioners, if it was permissible to resort to the net worth system at all, could properly be used to determine income of the petitioner or petitioners for each of the years in controversy. It was repeatedly indicated during the trial that their assets were to be regarded as belonging to both and that the assets of either might be treated as attributable to the other. Our findings are responsive to that assumption, and the term "petitioners" is used indiscriminately to refer either to Morris Lipsitz or to Morris and Helen Lipsitz.

There was some uncertainty at one or two stages of the trial as to the status of possible separate assets of each spouse, and the Court, realizing the almost insuperable difficulties that it would encounter in this otherwise confusing record if it were to be required to break down the various assets between husband and wife, called for clarification from counsel. Petitioners' counsel had just stated: "Your Honor, this is a net worth statement directed cases both parties [sic], Mr. and Mrs. Lipsitz, regarded as one. They are not treated as separate taxpayers." The Court thereupon addressed itself to both counsel and then inquired: "Now, do I understand both parties to agree that the assets of both these Petitioners may be considered together?" Mr. Luce, petitioners' counsel, replied: "Yes, your Honor; and that is the way the net worth statements have been set up." Mr. Anderson, Government counsel, replied: "That is correct." And except for an instance when petitioner Morris Lipsitz attempted to be evasive on cross-examination, he repeatedly treated his wife's assets as his own. Thus, referring to alleged cash in his vault he said: "It all belongs to me and all belongs to my wife. There is no distinction between man and wife." Referring to a loan said to have been made by Mrs. Lipsitz he said: "The loan was made by my wife. Still, it is our money just the same."

This case was unambiguously presented to us by counsel for both sides on the theory that the net worth statement of both spouses was to be used for all the years in controversy, and it was clear to us that both sides endeavored to present in evidence all known assets of both spouses. Our findings and conclusions are based on the same theory.

was evasive and his memory conveniently failed him at important points. We had ample opportunity to observe him for long periods on the witness stand and to appraise his testimony in the light of other evidence before us, and we are satisfied that he did not have scrupulous regard for the truth.

Throughout the Government's investigation of Lipsitz' affairs it encountered great difficulty in obtaining records from him. There was evidence about a fire at the Warner Ice Company in February 1938, in which petitioner claims his records were destroyed. However, we are left in considerable doubt not only to what extent, if any, the Warner Ice Company records were lost in this fire, but also whether Lipsitz' personal records were ever kept at the Warner Ice Company. He had 2 large safes in his home, and it is more than likely that the important papers bearing upon his personal finances were kept in those 2 safes. Furthermore, this case involves the years 1938–1945, and except for a small part of the first year this period was subsequent to the date of the fire. Notwithstanding specific requests for canceled checks and bank statements none was offered to the Government for inspection, and only 2 checks were produced at the trial. We do not believe his explanation that he had no canceled checks or stubs. It was all too plain that he was determined not to permit too close an examination into his affairs.

His affairs were often conducted in a secretive and confusing manner. Petitioners had interests in real estate in the names of nonexistent persons. They acquired property in the following fictitious names: "Fred Jacobi," "Vernon Birk," "Regine E. Eisenstover," and "Morton and Loraine Pilstiz." Government agents were able to discover a number of the properties involved only as a result of examination of Recordak films of checks at a bank. Disclosure by Lipsitz as to these fictitious names occurred only after the transactions had been discovered by the Government. When asked at the trial as to what, if any, other names he used in acquiring property, Lipsitz was evasive and sought refuge in his alleged inability to remember.

Our findings of fact are largely dispositive of this case. In making these findings our path was beset with many difficulties. In some instances we did not believe petitioner's testimony at all, such as his testimony that he had $25,000 in cash at his home at the beginning of the period under review. A prior sworn statement which he made before internal revenue agents pointed in the opposite direction, and his effort on the witness stand to explain away the prior statement was unconvincing.

In other instances, such as petitioner's testimony about expenditures to rehabilitate dilapidated property, we were satisfied that he made such expenditures but not in the amounts claimed by him. We think

that the respondent erred in failing to give petitioners credit for any such expenditures. Our findings as to petitioners' interests in the various properties involved include an amount for such expenditures, but not as much as claimed by Lipsitz. In an effort to corroborate the amounts asserted by him, appraisals were introduced by disinterested, reputable experts. But these appraisals were designed to show merely what the improvements to the properties would have cost at the time they were said to have been made. These appraisals lose much of their weight not only because they are based in part upon Lipsitz' representations to the appraisers, but also because the appraisers assumed that the work was done by contractors paying customary prices for materials and labor. The evidence before us, however, is to the effect that Lipsitz did most of the work himself with the assistance of his son, supplemented by cheap labor, and with materials that he procured at wholesale prices. Accordingly, in giving petitioners credit for capital expenditures on the various properties, we have scaled down the amounts claimed so as to accord with what in our best judgment was actually paid for capital improvements. Cf. *Cohan* v. *Commissioner*, 39 F. 2d 540, 544 (C. A. 2). Similarly, in some other instances where Lipsitz testified as to amounts expended, we have made findings in reduced amounts where we were satisfied that he was presenting inflated figures.[2]

We do not mean to suggest that we have resolved all doubts against Lipsitz' testimony. Our problem was one of appraising the testimony in the light of the entire record and its inherent credibility. Thus we found, in accordance with his contention, that a $500 bond standing in his name did not represent an investment made by him but had been inherited by him from his father. Similarly, we accepted his

---

[2] Thus, in connection with expenditures for construction of and improvements to an ice manufacturing plant, we have given full weight, for example, to testimony of a representative of the York Corporation as to equipment which that company sold to petitioner. But we were unwilling to accept at face value so-called corroborating testimony that the cost of an ice plant was about $1,000 per ton capacity; for, to the extent that original cost is relevant, the plant in question was not constructed in the usual manner, under the direction of a contractor incurring normal costs for labor and materials. Moreover, in connection with the assets formerly in the hands of the Warner Ice Manufacturing Corporation, it must be remembered that the corporation was liquidated on July 31, 1937. That liquidation was a taxable transaction and the assets thereupon took on a new basis, namely, their then market value. Some indication of the value of those assets at that time is the fact that they, together with other assets relating to the ice business, were sold in 1941 for $57,500. The witness Keeny testified that the value of an ice plant between 1937 and 1941 "ran along about even to the beginning of the war, and then it increased quite a bit." He later made it clear that he was using the term "war" to refer not to the time of actual commencement of hostilities by this country but to the time when the country was beginning to adapt itself to a war economy, after 1939. Accordingly, notwithstanding his general testimony of value measured at $1,000 a ton capacity, the fact that the very properties in question were included in assets sold in 1941 at $57,500, at a time when values had risen, is strong evidence that those properties had a lower value in 1937. Our findings in relation to the ice properties are predicated not only upon the foregoing considerations, but also upon an examination of all the relevant details in the record, which are too numerous to set forth.

testimony, corroborated by his son, Alvin, that he became indebted to Alvin in the amount of $1,500 a year during the years 1942–1946. We made this finding without strong conviction, for there was much to suggest that the alleged indebtedness did not in fact exist; yet, on studying all the evidence, we felt that the balance was slightly in favor of the finding we made. Again, we found, in accordance with petitioners' contention, that Lipsitz made a loan in the amount of $20,000 to his brother in 1935, which was repaid during the tax years. Here, too, our finding was without strong conviction, for prior inconsistent statements made by the brother cast doubt upon the alleged transaction; however, we concluded from the evidence as a whole that the scales tipped slightly in favor of petitioners on this matter, and made our finding accordingly.

The record is complex and diffuse. Fragments of evidence relating to particular facts in controversy are scattered over many hundreds of pages of testimony and in many exhibits. What may appear to be uncontroverted testimony at one point may take on an entirely different aspect when examined in the light of the record as a whole. We do not deem it necessary to explain our thought processes or chain of reasoning in making all our findings. To do so would expand this opinion beyond all reasonable length. Suffice it to say, our findings represent our best judgment, based on the entire record, on all the disputed items, and those findings form the basis for our ultimate findings of fact as to the amount of income for each of the years in question.

There remain for discussion only three aspects of this case: (1) The amounts at which petitioners' investments in certain properties are to be included in the net worth statement where petitioners entered into long-term leases providing for the payment of ground rents; (2) whether taxes paid with respect to the so-called Pilstiz returns must be taken into account in determining the deficiencies; and (3) whether fraud has been proved.

*Ground Rents Created.*—A dispute exists between the parties as to the amount at which certain interests in property should be included in the net worth statement, where petitioners have sold a building, retaining title to the land, and where the purchaser has executed a 99-year lease on the land agreeing to pay so-called ground rent. Petitioners insist that it is their cost of the land involved that is to be included in the net worth statement. Respondent, on the other hand, contends that the ground rent must be capitalized at 6 per cent, and that it is the capitalized figure that must be included in the net worth statement.

Whatever may be the correct method of treating other aspects of ground rent in other circumstances (cf. *Pennsylvania Co. for Insurance on Lives & Granting Annuities*, 19 B. T. A. 699 affirmed 52

F. 2d 601 (C. A. 3); I. T. 2679; XII–1 C. B. 103; G. C. M. 2042, VI–2 C. B. 182), we are satisfied that for purposes of determining petitioners' increase in net worth in the circumstances of this case the correct amount to be included in the net worth statement is petitioners' actual investment in the property, not a capitalized value based on ground rents. The comparison of a taxpayer's net worth between two points of time for the purpose of determining taxable net income must be made in such manner as not to include any unrealized gains. Otherwise, the taxpayer would be charged with income that may not legally be attributed to him. In the case of the ground rents created by petitioners herein there was no evidence that any purchaser of a building made any downpayment on the land or in any way treated the transaction as one looking toward the acquisition of the land in such circumstances that the ground rent arrangement might be regarded as the equivalent of a purchase money mortgage. The ground rents here were nothing more than what they appeared to be, notwithstanding that Maryland law gave the lessee the right to "redeem" after 5 years. We think that the so-called creation of the ground rents in this case was no more than the execution of leases, which are productive of income only to the extent that rent is received. It was not proper to capitalize the rents and thus in effect charge the owner with realization of income in the year the leases were executed, as though the land had then been disposed of at a profit. Moreover, even if the creation of a ground rent be regarded in some manner as the equivalent of an installment sale, which was not the fact here, petitioners certainly could not be forced to account in one year for the full amount of profit to be realized on such sale. We conclude that petitioners' position on this aspect of the case is correct.

*Income Reported on the Pilstiz Returns.*—As shown by our findings, tax returns in the fictitious name of "Pilstiz" were filed for the years 1942 through 1945, with respect to income from the building at 31 West Lexington Street, Baltimore. Such returns were in addition to returns filed during those years under petitioners' true names which did not include any income from that building. In determining petitioners' unreported income and the deficiencies before us, the Commissioner did not give petitioners credit for the income reported on the Pilstiz returns or the taxes paid with respect thereto. Since Litpsitz and Pilstiz were the same person we think that the deficiencies must take into account the taxes already paid in connection with the Pilstiz returns.

*Fraud.*—The respondent determined that petitioners were liable for additions to tax under section 293 (b) because of fraud with intent to evade tax. The burden is on the respondent to establish such fraud. In the case at bar, the issue of fraud assumes added importance since the years 1938 through 1942 are closed for tax purposes because of

the statute of limitations if the respondent fails to prove fraud. We think, however, that the respondent has sustained his burden.

Throughout the years in issue, petitioners consistently understated their income. The returns for all of the years, except 1945,[3] were prepared by a deputy collector of internal revenue upon information submitted by Lipsitz as to a "profit" which he made, without enumeration of expenses or items of income. The profit figures were of such character as to defy analysis. All attempts at the trial to determine whether certain types of income (e. g., ground rent or interest) were included therein met with failure. We had only Lipsitz' unconvincing assurances that they were included. He filed no income tax returns whatever for any year prior to 1933, and, beginning with 1933, he filed returns disclosing only comparatively nominal amounts of income, despite the fact that he portrayed himself as being worth about $400,000 or $500,000. His affairs were at times conducted in the names of nonexistent persons; and other motives, apart from tax evasion, only partly explain the use of such fictitious names. Cf. *Jack M. Chesbro*, 21 T. C. 123, 130. The foregoing considerations are by no means all-inclusive, and taking into account the entire record we have concluded that at least a part of the deficiency for each year 1938 to 1944, inclusive, has been shown by clear and convincing evidence to be due to fraud with intent to evade tax.

*Decisions will be entered under Rule 50.*

---

[3] The return for 1945 was prepared by an accountant after Lipsitz became aware that the investigation into his affairs had commenced. We have found no understatement of income for that year.