UNITED STATES v. CLARK.

Crim. A. No. 23,067.

United States District Court
S. D. California, Central Division.

Aug. 4, 1954.

Laughlin E. Waters, U. S. Atty., Los Angeles, Cal., by Norman W. Neukom, and Richard A. Lavine, Asst. U. S. Attys., Los Angeles, Cal., and George Willi, Sp. Asst. to the Atty. Gen., Tax Division, for plaintiff.

Charles H. Carr. William K. Rasmussen, Los Angeles, Cal., J. A. Donnelley, San Diego, Cal., for defendant.

YANKWICH, Chief Judge.

■ Whenever the Government and the defendant in a criminal case waive a jury, they are entitled to not just a verdict one way or the other, but to the reasons behind it. This conforms to the Canons of Judicial Ethics of the American Bar Association (Canon 19) and to a practice which I have followed consistently.[1] So in what follows I shall set forth the problem involved in this case and the solution arrived at.

## I

### The Offense Charged

■ The defendant is charged with violation of Section 145(b) of the Internal Revenue Code,[2] i. e. with having willfully attempted to evade and defeat his individual income taxes and those of his wife Lena G. Clark for each of the years 1946 and 1947 by filing and causing to be filed on behalf of himself and his wife false and fraudulent income tax returns wherein he knowingly and unlawfully understated and caused to be understated his and his wife's net income and income tax liability. Each of the income tax returns involved was filed with the Collector of Internal Revenue for the Sixth Internal Revenue Collection District of California, at Los Angeles, California. It is, therefore, within the jurisdiction of this court.[3]

■ The taxable income reported on both the 1946 and 1947 individual income tax returns of Lena G. Clark consists entirely of her community property one-half, as established under Nevada law, of the taxable income reported on the 1946 and 1947 individual income tax returns of her husband, Wilbur I. Clark. Accordingly, if there was a willful understatement of taxable income on the returns of Wilbur I. Clark for the years 1946 and 1947, it would necessarily result in a willful understatement of taxable income, in corresponding amounts, on the separate returns of Lena G. Clark for the same years.

The underpayment charged under count one was $21,559.10; on count two, $21,620.84; on count three, $3,261.13; and on count four, $3,465.38.

1. United States v. Food and Grocery Bureau of Southern California, D.C.Cal. 1942, 43 F.Supp. 974; United States v. Corlin, D.C.Cal.1942, 44 F.Supp. 940.

2. 26 U.S.C.A. § 145(b).

3. Rule 18. Federal Rules of Criminal Procedure, 18 U.S.C.A.

Through Bills of Particulars furnished prior to the trial it became known that the Government would use what is known as "the net worth" method in presenting its case. This formula has been defined in this manner:

"Increase in net worth, plus nondeductible disbursements, minus nontaxable receipts, equals taxable net income. It is basic to this proposition that a man's expenditures and acquisition in any year (which can be demonstrated) must derive from what he had at the beginning plus what he receives during the year; after the nontaxable income has been eliminated or negatived, the balance of the receipts must constitute taxable net income." [4]

There is no direct statutory provision sanctioning the use of this method. However, Section 41 of the Internal Revenue Code requires that the net income should be computed

"in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income." [5]

## II

### The Elements of the Offense

The section under which the prosecution is had requires proof beyond a reasonable doubt of two elements: (a) that there was attempt to evade the taxes due, and (b) that the attempt was willful. If these be present, it matters not whether the source of the income is legal or illegal.[6]

Indeed, the Government insists on participating in the fruits of the most illegal transactions. It draws the line only at theft of property as to which it makes no claim in the thief's hands upon the ground that a thief acquires no title.[7]

The Supreme Court, in a leading case has pointed to the fact, which is very significant in every prosecution under this section, that more is required than a mere omission to make a return and pay a tax:

"We think that in employing the terminology of attempt to embrace the gravest of offenses against the revenues Congress intended some willful commission in addition to the willful omissions that make up the list of misdemeanors. Willful but passive neglect of the statutory duty may constitute the lesser offense, but to combine with it a willful and positive attempt to evade tax in any manner or to defeat it by any means lifts the offense to the degree of felony.

"Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation. Nor would we by definition constrict the scope of the Congressional provision that it may be accomplished 'in any manner'. By way of illustration, and not by way of limitation, we would think affirmative *willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. If the tax-evasion mo-*

4. 39 A.B.A. Journal, 1953, 251.

5. 26 U.S.C.A. § 41.

6. United States v. Sullivan, 1927, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037.

7. Roberts v. Commissioner of Internal Revenue, 9 Cir., 1949, 176 F.2d 221, 225, 10 A.L.R.2d 186; Rutkin v. United States, 1952, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833.

*tive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime."* [8] (Emhpasis added.)

The courts have generally held that to satisfy these requirements the return must be a fraudulent one.[9] But it is to be noticed as the writer of the article referred to in the American Bar Association Journal states, that what arose out of a special situation in cases where no adequate books have been kept is now so commonly used that there is danger that a prosecution for a serious felony may be based entirely upon disagreement as to bookkeeping methods. And the burden of proof may be shifted entirely on the taxpayer to explain not some items concealed by failure to keep books, but items which books kept in the regular course of business and of the type sanctioned by reputable accountants for a particular business *may not* reflect. Some courts have warned against such contingencies.[10]

A study of the cases will reveal the fact that the original use of this method was sanctioned because it related to illegal activities by persons, who, because of the nature of their business, could not and would not keep books adequately reflecting their income. Illustrative perhaps is the leading case decided by the Supreme Court which sanctioned such method.[11] There, large-scale gambling was carried on in a state in which gambling was not allowed. Mr. Justice Frankfurter characterized the defendant as a "gambler on a magnificent scale". Johnson concealed his ownership of gambling establishments in Chicago, *a city in which no legal gambling is allowed.* Records kept were meager and even such as were kept were destroyed. In the circumstances, the Court used the following language:

"It is not to be expected that the actual financial transactions of such a vast illicit business would appear by direct proof. Compare United States v. Wexler, 2 Cir., 79 F.2d 526. The long duration of this gambling business, the substantial evidence of the operation of the law of probability in favor of the houses, such records as there were pertaining to the private banking facilities and currency exchanges which were at the service of these houses, made it not a matter of tenuous speculation but of solid proof that there were winnings of a substantial amount which Johnson did not report. * * *

*"Of course the government did not have to prove the exact amounts of unreported income by Johnson. To require more or more meticulous*

---

8. Spies v. United States, 1943, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418.

9. Rick v. United States, 1947, 82 U.S.App. D.C. 101, 161 F.2d 897, 898; United States v. Raub, 7 Cir., 1949, 177 F.2d 312, 315; United States v. Rosenblum, 7 Cir., 1949, 176 F.2d 321. It may be conceded that the courts have, in late years, sustained many convictions in which this method was used. The following are among the last cases on the subject: Barcott v. United States, 9 Cir., 1949, 169 F.2d 929; Bell v. United States, 4 Cir., 1950, 185 F.2d 302; United States v. Caserta, 3 Cir., 1952, 199 F.2d 905; Gendelman v. United States, 9 Cir., 1951, 191 F.2d 993; Davena v. United States, 9 Cir., 1952, 198 F.2d 230; O'Connor v. United States, 4 Cir., 1953, 203 F.2d 301; Montgomery v. United States, 5 Cir., 1953, 203 F.2d 887; Remmer v. United States, 9 Cir., 1953, 205 F.2d 277; McFee v. United States, 9 Cir., 1953, 206 F.2d 872; Chieftain Pontiac Corp. v. Julian, 1 Cir., 1954, 209 F.2d 657; Holland v. United States, 10 Cir., 1954, 209 F.2d 516; Ford v. United States, 5 Cir., 1954, 210 F.2d 313; Olender v. United States, 9 Cir., 1954, 210 F.2d 795; Smith v. United States, 1 Cir., 1954, 210 F.2d 496; Bateman v. United States, 9 Cir., 1954, 212 F.2d 61; Carneal v. United States, 4 Cir., 1954, 212 F.2d 20; Hooper v. United States, 10 Cir., 1954, 213 F.2d 30.

10. Bryan v. United States, 5 Cir., 1949, 175 F.2d 223; United States v. Fenwick, 7 Cir., 1949, 177 F.2d 488, 492.

11. United States v. Johnson, 1943, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546.

*proof than this record discloses that there were unreported profits from an elaborately concealed illegal business, would be tantamount to holding that skilful concealment is an invincible barrier to proof."* [12] (Emphasis added.)

### III

### The Legality of Nevada Gambling

In the case before us we are confronted with a gambler who operates in a state in which gambling is legalized. The Government, in its brief, makes this statement:

"During the years involved in this indictment, and for some period prior thereto, Wilbur I. Clark described his occupation on his federal income tax returns as that of 'professional gambler'. It is not anticipated that it will be disputed that from the time when Wilbur I. Clark migrated from California to Las Vegas, Nevada, about June, 1944, until the present, he has at all times been engaged in the operation of resort-gambling casinos (admittedly lawful enterprises under the laws of the State of Nevada) in a proprietary capacity."

The use of the phrase "professional gambler" *does not imply approbrium* since gambling is legal in Nevada. At any rate, a Government which insists on collecting income from illicit enterprises [13] is not in a position to play the moralist. By an Act of the Legislature of Nevada approved March 19, 1931, gambling games and gambling devices may be licensed. [14] When so licensed the conduct of gambling games is lawful. The statute is now codified. The Supreme Court of Nevada has sustained the right of the legislature to enact this law, [15] and the United States District

Court of Nevada has held that a gambling enterprise operated under Nevada law was a monied and business corporation within the meaning of the Bankruptcy Act.* The language of the late Judge Norcross is very appropriate:

"As the Bankruptcy Act was passed for the benefit of creditors of a bankrupt as well as debtors who may voluntarily apply for the relief it affords, we see no reason why creditors of a corporation engaged in any enterprise for pecuniary profit should be denied a relief afforded creditors generally merely because the character of the debtor's business is one not usually countenanced by statute. Certainly Congress did not intend to place corporations engaged in a business of this character as being in a favored class, such that when creditors who have performed labor and furnished merchandise, materials, and supplies in the ordinary course of business, apply for an adjudication in bankruptcy, the debtor may say, 'No, my assets may not be taken in such manner to pay in part my debts because of my iniquity.' The contention that respondent is not subject to an adjudication in bankruptcy because of the character of the business in which it is engaged is without merit." [16]

And the Supreme Court of Nevada has held that gambling devices are not "lotteries" within the prohibition of the constitution of Nevada that no lotteries "shall be authorized". [17]

It is apparent that the net worth method was intended to be used chiefly in cases where, (1) there were no books of account kept in the ordinary course of business, or (2) books were not kept in the manner in which a person engaged in a legitimate enterprise would carry

---

12. United States v. Johnson, supra, 319 U.S. at pages 517, 518, 63 S.Ct. at page 1240.

13. United States v. Sullivan, 1927, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037.

14. Nevada Stats.1931, c. 99, p. 165.

15. Ex parte Pierotti, 1919, 43 Nev. 243, 184 P. 209.

* 11 U.S.C.A. § 22.

16. In re Deauville, Inc., D.C.Nev.1931, 52 F.2d 963, 966–967.

17. Ex parte Pierotti, supra Note 15.

them.[18] The defendant comes under neither category. His gambling activities were carried on in the State of Nevada where he is considered a business man like any other. Indeed the fact that he was placed at the head of the government's war bond drive in Las Vegas indicates how men of his type are considered in that community. His books relating to various enterprises were set up by a nationally known firm of accountants who specialize in keeping books for hotels and similar establishments. The representative of that firm has stated that the method was uniform throughout the State of Nevada. The only deviation from what might be good accounting practice was the method of accepting the report of the casino from the men in charge of the various gambling tables. A different method would have required the accounting firm to have a man stationed at each of the gambling tables and count the money at the end of each day. It is also in the evidence that in large hotels, in states other than Nevada, the bars are treated in similar manner. Judge Chesnut has stated well the test for determining the sufficiency of books:

"The critical test as to the sufficiency of the books on their face is whether they are sufficient to calculate the net income. If they are sufficient in this respect then the simpler the books the better. There is no prescribed detail as to just what books or how many must be kept. The question in each case must be determined on its particular facts and in view of the nature, volume and complexity of the business. Here the books as kept do show day by day receipts and expenses. If the figures are correct the books are sufficient to show the net income." [19]

Because of the nature of the enterprises in which the defendant was engaged, certain indicia of ordinary business transactions lose their significance. Men engaged in ordinary businesses do not keep on hand in safe deposit boxes large amounts of cash. When they do, suspicion attaches to the fact. Yet the evidence in the case elicited from a Government witness was that the sum of $50,000 was extracted from a safe deposit box in 1945,—one of several held by the defendant at a Nevada bank —in the presence of an officer of the bank, who stated that, after the sum was extracted, the box still remained about one-third full. The same witness also testified that the money was in rather large denominations because it took only a few minutes to count it. The money was used to purchase for the

18. See, Talley v. Commissioner, 1953, 20 T.C. 715. There is nothing in Lipsitz v. Commissioner, 1954, 21 T.C. 917, to which the Goverment calls our attention which goes counter to this statement of the law. There the court stated:

"The net worth method is not a system of accounting; it is not a substitute for either the cash or the accrual basis of accounting or any other recognized method of keeping books. When correctly applied to the facts of a particular situation it is merely evidence of income. And when the increase in net worth is greater than that reported on a taxpayer's returns or is inconsistent with such books or records as are maintained by him, the net worth method is cogent evidence that there is unreported income or that the books and records are inadequate, inaccurate, or false." Lipsitz v. Commissioner supra, 21 T.C. at page 931.

However, a study of the entire opinion shows that over a long period of years the petitioners consistently overstated their income, that the husband maintained only "fragmentary books and records". Indeed, the opinion states that beginning with 1933 the husband filed returns disclosing comparatively nominal amounts of income despite the fact that he held himself out as being worth $400,000.00 or $500,000.00. His affairs the court found:

"were at times conducted in the names of nonexistent persons; and other motives, apart from tax evasion, only partly explain the use of such fictitious names." 21 T.C. at page 937. There are no such attempts to "cover up" here.

19. Bechelli v. Hofferbert, D.C.Md.1953, 111 F.Supp. 631, 633.

defendant in the name of an employee under a fictitious name, an additional amount of government war bonds. As already stated, the defendant headed the drive and as he had already subscribed to his share, he did not desire the fact disclosed. So, here again, we have a different pattern from that followed by professional gamblers functioning outside the law. Their ostentation is proverbial. The government sees in this an attempt to "cover up". I cannot agree. The defendant was solicited by the banker to increase his subscription. He made it in the name of an employe, because he hesitated to show his affluence except when transacting business privately. In either case, there was no purpose to deceive or conceal.

Early in the year 1946, two large transactions involving currency appear. On January 19, 1946, the defendant, repaid a $60,000 loan and $408.33 interest with currency. The payment having actually been made after banking hours on January 18th, it was put through the transactions of the following day. On March 12, 1946, a payment of $65,000 in cash was made on a real estate transaction. Neither of these was taken into consideration by the agents in preparing the original Bill of Particulars in computing the defendant's net worth.

To some extent the defendant's failure to commit himself definitely to the agents when asked to estimate the amount of cash he carried in his safe deposit boxes may have been responsible for the attitude.

■ As this is a criminal prosecution and not a matter of accountancy, we cannot infer evil motive from failure to make full disclosure. Nor need we concern ourselves with the question where the money came from. Regardless of its origin, if it was not income in the two taxable years, its presence explains the unaccounted for increase in net worth. For it is evident that the pattern as to the two years changes entirely if this large amount of cash is taken into consideration. It cannot be assumed that cash on hand early in January and March of 1946 was not available on December 31, 1945. And the agent admitted that if the amounts of $125,000 for the year 1946 were taken into consideration there would be no taxable income for that year and for the subsequent year. And even if it does not entirely wipe out the claimed underpayment, no inference of fraud can be drawn from the fact. The books kept by the defendant and the records of these transactions appearing adequate in the circumstances, the contrary inferences drawn by the agent in arriving at his net worth estimate must be disregarded. And certainty as to government's starting point is gone.

One item in the bookkeeping set-up has been made the subject of some criticism,—that no special record seems to have been made of bad debts. Although the State of Nevada has legalized gambling, its courts do not permit the collection of gambling debts. [20] Neither do the courts of California. [21] It appears that the names of persons whose checks had not been paid were kept and were given to the agents, but they were unable to locate them because no addresses were furnished. Here, too, the nature of the business explains the situation.

■ A merchant is not likely to be much concerned with detailed records of debts that he knows *are not collectible in law*. So there is no inadequacy in the books of a character that would warrant their rejection as a means of reflecting

20. In re Deauville, supra Note 16.

21. Bryant v. Mead, 1851, 1 Cal. 441; Rose v. Nelson, 1947, 79 Cal.App.2d 751, 180 P.2d 749. This rule has been applied consistently in California, as the cases just cited decided nearly one hundred years apart indicate. The Supreme Court of California has extended the rule to apply to checks issued in a gambling establishment for the purpose of securing money with which to gamble. If the money is actually used for that purpose there can be no recovery. Hamilton v. Abadjian, 1947, 30 Cal.2d 49, 52, 179 P.2d 804.

the transactions actually carried on in the defendant's various enterprises.

## IV

### No Indicia of Fraud

The Supreme Court [22] has listed some of the methods from which willful attempt to avoid the tax could be inferred. They are: (1) double sets of books; (2) false entries or authorizations; (3) false invoices or documents; (4) destruction of books or records; (5) concealment of assets or covering up sources of income; (6) handling of one's affairs to avoid making the records *usual in transactions of the kind*; and, finally, (7) any conduct, the likely effect of which would be to mislead or to conceal. None of these badges of fraud exist in this case. To the contrary, we find memorials of both ordinary and extraordinary transactions.

Assuming that there may have been actual underpayment of tax in the two tax years, which more careful auditing might have avoided, the offense charged in the indictment cannot be made out without proof of willful fraud or deceit.

Certain books of the Desert Inn, Inc., for the year 1947, have disappeared through no fault of the defendant, but through the absconding of a certified public accountant in Las Vegas, Nevada, who did accounting work for the defendant and other operators, and who took with him some of the books and records of the defendant and other clients. However, the work sheets relating to the accounts of the defendant have been recovered and are in court. From them the accounts can be reconstructed. One item may be referred to. It is the rather arbitrary valuation placed upon the interest of the defendant in the Desert Inn, Inc., based not on its correct value, but arrived at by setting up an arbitrary figure of $107,000 as the value of the whole investment, then deducting amounts estimated to have been contributed by others in order to arrive at the value of Clark's interest. A true

valuation, as shown by the working papers, is, in itself, sufficient to wipe out the claimed tax for the entire year of 1947. There are other failures to give due credit for assets altogether or for their true value. Lack of longer time to prepare this statement prevents us from discussing them in detail. What has been said shows the danger of using the net worth-expenditures method in *any but extreme cases*, i. e., cases where there are no books and where the other badges of fraud already adverted to exist.

On an accountant's mere method of computation we are asked to put the mark of villainy on a person. This I am unwilling to do. One other matter should be adverted to. The defendant admitted that he enjoyed gambling in various casinos. He stated that it was a method of relaxation for him. The government insists that this being so he should have kept more accurate accounts of his winnings. The defendant stated that at the end of each year he jotted down the total of his winnings or losses from a mental picture. For one who gambles as a personal diversion this is not unreasonable to believe. Had this been *his only* occupation, the absence of more specific accounts might have some significance. But the defendant was engaged in seven or eight enterprises, ranging from ownership of hotel and restaurant properties to an investment company, in some as a partner, in others as a stockholder. The defendant, beginning with the year 1944, was associated with the following resort casinos: Clark-Smith Hotel, Co., partner; El Rancho Hotel, Inc., shareholder; El Rancho Vegas Casino, partner (this terminated early in 1946); Clark-Nevada Corporation, shareholder; Wilbur Clark, Inc., shareholder; Desert Inn. Inc., shareholder; Desert Inn Annex, partner; Wilbur Clark's Desert Inn, Inc., shareholder. In addition to this the defendant retained previously acquired equities in various businesses located in San Diego, California: Barbara Worth Hotel,

22. Spies v. United States, supra Note 8.

hotel; Monte Carlo Cáfe, cafe, cocktail lounge; South Seas Cafe, cafe, cocktail lounge; Bomber Card Room, card room; Motor Vessel Linda Lee, fishing boat. Books were kept for these enterprises. A national firm of accountants had representatives at the Las Vegas enterprise. One of the representatives, who testified at the trial, stated that at one time a staff of five were in the operation. In the circumstances, the failure to keep more specific data relating to personal gambling is unimportant. We doubt that many of the men who play cards for high stakes at the various California social clubs,—bridge or draw poker,—to mention two games which are legal in California, could give a more accurate account either to their wives or to the government. There is no requirement to keep books for sporadic activities. Stories of large winnings have a way of spreading fast. We have no doubt that if there had been unusual winnings unreported by the defendant, the government would have been able to trace them. Yet the only evidence introduced related to a check for $13,000 given in 1946 by J. W. Drown in payment of that amount won by the defendant. But this amount was reported on his income tax return for 1946, "as income from gambling (not included elsewhere)". Other "consequential amounts", as Mr. Willi called them, were on the 1945 and 1947 returns. It is inconceivable that the government should wish us to draw an inference *not from gains concealed but from gains revealed*. We cannot assume that the defendant has won other amounts unless there *is some* evidence of participation in other personal gambling activities not reported. Yet the government has found *no one* to testify that he lost an amount to the defendant which was not reported. And at the oral argument the government admitted that they *had no direct proof of actual winnings or earnings not reported*. This is a forthright admission. But it is also an admission of the weakness of the government's entire case.

At a conference held at Washington, in June 1953, at the defendant's request, certain statements were made by him, his accountant, and his counsel. They shed no light on the important problem before us,—wilful evasion. Certainly the statement made in 1953 and testified to by Mr. Willi, that only some $8,000 in cash was on hand in 1945 cannot overcome the contemporaneous bank and other records of 1945 and 1946 which indicate larger amounts in cash.

And herein is the anomaly of the case. When the defendant reveals facts, in conversation or through his acts, they are either used against him, if unfavorable to him, or discounted, if favorable. And if he is silent, his failure to make full disclosure is urged as an admission of guilt. The revenue agents disregarded the entire evidence of the money transactions involving $125,000. And even at the trial they would not admit the $50,000 and $60,000 incidents, although testified to by the government's own witnesses, and verified by bank records which stood unimpeached and of the existence of which they learned before the trial. The defendant did not make any admission of guilt or of any criminal intent in the conversation testified to by Orville L. Slark, a police officer of the city of Las Vegas. In late March or early April 1952, the officer approached the defendant at the suggestion of Commissioner of Police Wm. Piccole of Las Vegas, that he might secure employment as a security officer at the Desert Inn which the defendant and associates had caused to be built. As the witness had been active in the political affairs of Nevada in that year, 1952, the defendant told him that he was in difficulty over tax matters and that "if we couldn't come up with someone with connections in regards to using, you might say, pressure, or something of that nature, that he was going to have to do some time." He was asked if he knew anyone in the Los Angeles area who might help, to which he answered in the negative. The Internal Revenue Bureau has power to compro-

mise disputes over income taxes. There was no indictment pending at the time, so the statements are innocuous, of the type that anyone who has been led to believe that prosecution was contemplated might make. The witness had no connection with the Bureau of Internal Revenue. He wasn't *sought out by the defendant* and was not, as he admitted, asked to do anything dishonorable. What was said was certainly not an admission of the truth of the contemplated charges. It should be added that, unless there be other positive proof of the offense, these extra-judicial admissions, in themselves, cannot form the basis of conviction.[23]

■ These and other considerations would warrant the conclusion that there is no convincing proof of fraudulent concealment for either year. Indeed, there is no positive showing of additional tax due. But even if there were such showing, the offense would still not be proved, if wilfulness be absent.[24] However, our holding need not go that extent. It is enough to say that the evidence adduced by the government and the documentary proof offered on behalf of the defendant, by cross-examination and otherwise, raises a reasonable doubt in my mind as to his guilt. And I, sitting as a jury, am unwilling to brand this man a felon in the face of this doubt. This is not a condemnation of the net worth method, which has the approval of our courts,[25] and which I have sanctioned in proper cases. It has its uses. But as said by the Tax Court:

"The limitations of the increase in net worth method are well known. Often it results in an inaccurate statement of income or the placing of income in the wrong year and, at best, it yields only an approxima-

tion. It is a method of reconstructing income rather than a method of computing it."[26]

As said by the Court of Appeals for the Seventh Circuit:

"Remembering that the government has the burden of proof in a criminal case, that the burden never shifts to defendant, that circumstantial evidence must be of such character as to exclude every reasonable hypothesis except that of guilt, it necessarily follows that, when the government relies upon circumstances of increased net worth and expenditures in excess of reported income to establish income tax evasion, the basic net worth must be established. The defendant is not compelled to take the witness stand; he is not compelled to make proof that he is innocent, but he must be proved guilty by the evidence beyond all reasonable doubt, and where there is uncertainty as to whether all the assets of defendant are included in the government's computation of net worth, it follows that its computations can not be relied on. Essential proof of no other assets is the cornerstone of the evidence of the government; that cornerstone being faulty, the whole edifice is so weakened as to be undependable as proof of guilt beyond all reasonable doubt."[27] (Emphasis added).

This case was cited with approval by the Court of Appeals for the Ninth Circuit.[28] A similar warning was given by the Court of Appeals for the Fifth Circuit:

"This is another of the growing list of criminal cases in which the government, having no or little di-

23. Spriggs v. United States, 9 Cir., 1952, 198 F.2d 782, 783; Calderon v. United States, 9 Cir., 1953, 207 F.2d 377, 378; Smith v. United States, 1 Cir., 1954, 210 F.2d 496, 499.

24. Spies v. United States, supra Note 8; Wardlaw v. United States, 5 Cir., 1953, 203 F.2d 884.

25. See cases cited in Note 9.

26. Talley v. Commissioner, supra Note 18.

27. United States v. Fenwick, supra Note 10.

28. Calderon v. United States, supra Note 23.

**618**

rect evidence of defendant's guilt to offer and endeavoring to prove it by circumstantial evidence, attempts to do so by what may be called the net worth and expenditures method of proof. In this attempt, unless the greatest care is taken by the district judge to prevent it, there is danger of the case being tried on a theory which, keeping to the ear the promise that a defendant is presumed innocent until his guilt is established beyond a reasonable doubt, breaks it to the hope by allowing a series of theoretical estimates and computations as to defendant's income to take the place of proof of it."[29]

■ It follows that the net worth method should not be used in a case in which the taxpayer, although a gambler, engages in gambling in the only state in the union which legalizes it and where he uses methods of bookkeeping common to the profession in that state and sanctioned by reputable auditing firms. And the government, willing as it is to share in the profits of such enterprise should be willing to make some concessions to the methods which a national accounting firm recognizes as proper in Nevada, although these methods do not come up to the standards which agents of the Internal Revenue Bureau would prescribe in the circumstances if they had power to do so, which they do not have. After all, the Internal Revenue Code gives recognition to the methods of "accounting regularly employed in keeping the books of [the] taxpayer".[30]

I find the defendant not guilty.

29. Demetree v. United States, 5 Cir., 1953, 207 F.2d 892, 893.

30. 26 U.S.C.A. § 41. Apposite is the following language of the District Court in a case referred to by the Tax Court in Talley v. Commissioner, supra Note 18:
"The ascertainment of the amount of the net taxable income of the taxpayer is the ascertainment of a fact. Real facts, and not bookkeeping entries, give rise to income. Books of account are no more than evidential. They are nei-

ther indispensable nor conclusive. * * * "But this does not mean that the return of income should not be made in accordance with the taxpayer's books, for ordinarily the books are evidential in reflecting the facts. But income includes only the receipt of actual cash or its equivalent, and the courts, in the absence of a clear direction to the contrary, construe a revenue law in accordance with an intention to reach actual income." In re Sheinman, D.C.Pa.1926, 14 F.2d 323, 325. (Emphasis added.)