## Milford R. BAUMGARDNER and Pearl E. Baumgardner, Petitioners,
### v.
### COMMISSIONER OF INTERNAL REVENUE, Respondent.
### No. 15397.

United States Court of Appeals
Ninth Circuit.

Dec. 21, 1957.

This Court has summed up the problem succinctly in one of the cases just cited:

"It is not our function to retry the case. Unless clear error appears, we cannot disturb a Tax Court's finding or conclusion." [4]

## I.

### The Net Worth Method.

The real party in interest in this case is Milford R. Baumgardner. His wife was joined merely because, under the community property law of California, she joined in making some of the returns. The Court found her guiltless of any fraud. So when we refer to the "taxpayer", we are referring to Baumgardner.

■ The Tax Court modified in some respects the determinations of deficiencies made by the Commissioner. As they were favorable to the taxpayer, he is not complaining of them. So in what follows we will refer only to the Findings to which objection is made. Before doing so, it is well to advert to the fact that where the taxpayer, a man who for many years had held office in the police department and for several years was Chief of Police of a small city, has a fair education and enjoys membership in religious and fraternal organizations, having held official positions in some of them, chooses not to keep books to record his business transactions, or preserve records and data from which exact computations can be made, he bears the responsibility for the consequent lack of certitude in estimating his tax:

"Absolute certainty in such matters is usually impossible and is not necessary; the Board should make

George Bouchard, Los Angeles, Cal., for appellants.

Charles K. Rice, Asst. Atty. Gen., Arthur I. Gould, John N. Stull, A. F. Prescott, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before LEMMON and BARNES, Circuit Judges, and YANKWICH, District Judge.

YANKWICH, District Judge.

■ The problems involved in this petition to review the decision of the Tax Court entered on August 30, 1956, determining deficiencies for the years, 1942, 1944, 1947, 1948, 1949, 1950 and 1951, and assessing penalties for some of the years involved, 1945, 1947, 1948, 1949, 1950 and 1951, which included fraud penalties for some of the years are chiefly factual.[1] This court has repeatedly stated the limited scope of our review of Findings of the Tax Court.[2]

Given the opportunity of the trial court to appraise the credibility of witnesses in front of it, we will not ordinarily hold a ruling to be clearly erroneous unless

"the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." [3]

1. 26 U.S.C., 1952 Ed., § 1141(a) and (c); I.R.C.1954, § 7482(a) and (c); Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.

2. National Brass Works, Inc., v. Commissioner, 9 Cir., 1953, 205 F.2d 104; Ward v. Commissioner, 9 Cir., 1955, 224 F.2d 547, 549-550; Wener v. Commissioner, 9 Cir., 1957, 242 F.2d 938, 944; Ferrando v. United States, 9 Cir., 1957, 245 F.2d 582, 587-588.

3. United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746; National Brass Works v. Commissioner, supra Note 2, 205 F.2d at pages 106-107; McGah v. Commissioner, 9 Cir., 1954, 210 F.2d 769, 771-772; Earle v. Woodlaw, 9 Cir., 1957, 245 F.2d 119, 126-128.

4. National Brass Works v. Commissioner, supra Note 2, 205 F.2d at page 107.

as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making." [5]

This Court applied the principle in a case involving a taxicab driver who objected to a determination of a deficiency based upon an approximation of his annual earnings:

"The petitioner had kept no books: So the Tax Court had to determine the amount from such evidence as was presented to them. If the result is an approximation, the lack of exactitude is traceable to the petitioner's own failure to keep accurate accounts."[6]

## II.

### The Badges of Fraud.

▮▮▮ Failure to make or keep records usual in business transactions is one of the badges of fraud in tax cases.[7] The burden, of course, is upon the Commissioner to prove fraud.[8] Where books are not available and the Commissioner resorts to the net worth method of proving the tax due, the Tax Court must follow the cautionary considerations laid down by the Supreme Court in the cases dealing with matters of this character.[9] However, the Supreme Court did not lay down any rigid formulas by which fraud in tax cases, whether civil or criminal, should be determined. It merely pointed to the unreliability of some of the methods used in computing net worth. Significantly, in none of the cases referred to was there a reversal because of the use of the method. And the only one in

which the Court of Appeals had reversed the conviction the Supreme Court affirmed.[10] And Courts of Appeals, since the promulgation of these decisions, have adhered to the view that even in net worth cases, the conclusions and inferences drawn from admitted facts by the Tax Court will not be disturbed unless there is clear or palpable error.[11] This principle will be applied although the tax reported corresponds with the books of the taxpayer. The Court of Appeals for the Seventh Circuit has summed up the matter in this language:

"Taxpayer obviously overlooks the fact that the net worth technique of computing income is not a method of accounting. It is no more than proof of income by circumstantial or indirect evidence. If a taxpayer's net worth has increased over a period of time and the increase is not due to nontaxable receipts or nontaxable appreciation of assets, the conclusion is inescapable that taxable income has been received. The fact that the taxpayer's books and other records are consistent * * * proves nothing more than that they are * * * truthful or accurate. See Holland v. United States, 348 U.S. at pages 131–132, 75 S.Ct. at page 133. In short, the apparent adequacy of the taxpayer's books is the very thing that the net worth method attacks by independently demonstrating the receipt of unrecorded and unreported taxable income. The Holland decision makes it clear that there are no conditions

5. Cohan v. Commissioner, 2 Cir., 1930, 39 F.2d 540, 543–544.

6. Roberts v. Commissioner, 9 Cir., 1949, 176 F.2d 221, 226, 10 A.L.R.2d 186. See, United States v. Burdick, 3 Cir., 1954, 214 F.2d 768, 772.

7. Spies v. United States, 1943, 317 U.S. 492, 499, 63 S.Ct. 364, 87 L.Ed. 418; United States v. Burdick, supra, note 6.

8. § 7454 I.R.C.1954, 26 U.S.C., 1952 Ed., Supp. II, § 7454.

9. Holland v. United States, 1954, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150; Friedberg v. United States, 1954, 348 U.S. 142, 75 S.Ct. 138, 99 L.Ed. 188; Smith v. United States, 1954, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192; United States v. Calderon, 1954, 348 U.S. 160, 75 S.Ct. 186, 99 L.Ed. 202. See, Blackwell v. United States, 8 Cir., 1957, 244 F.2d 423, 429; United States v. Clark, D.C. Cal.1954, 123 F.Supp. 608.

10. United States v. Calderon, supra Note 9.

11. See, Commissioner v. Thompson, 3 Cir., 1955, 222 F.2d 893; Davis v. Commissioner, 7 Cir., 1956, 239 F.2d 187.

precedent to the utilization of the net worth technique." [12]

## III.

### The Facts Proved.

Many of the facts in the case are not questioned either because shown by undisputed testimony or by stipulations and exhibits in the record. A detailed statement of the facts is found in the Tax Court's opinion. We will give a brief summary only. For in this proceeding the only findings actually in dispute are those relating to cash on hand at the beginning of the net worth period, December 31, 1940, the taxpayer's interest in the Embassy Club, a legalized card club at Gardena, California, and the general finding of fraud which reads:

"The returns for each of the years in which there is a deficiency, except those for the years 1945 and 1947 filed by Pearl, were false or fraudulent with intent to evade tax and part of the deficiency in each of such years was due to fraud with intent to evade tax."

### A. *Ownership of Interest in Card Club*

We will dispose of the card club ownership first. It is argued that the taxpayer did not receive any profits from the Club.

The finding as to his interest in the Club is amply sustained in the record. There is on file an amendment to the Articles of Incorporation of the Club signed and verified by the taxpayer on January 1, 1951, which shows his ownership of a 5% interest in the net profits of the club as a limited partner. This was a gift to him by another of the partners. The amended articles were filed in the official records of Los Angeles County on February 5, 1951. The income tax return filed by the Club showed the sum of $1,116.54 as his distributive share of the profits for the year 1951. On March 10, 1952, the accountant for the Club notified the taxpayer of that fact, "showing the figures that he should use on his personal return", as he testified at the trial. So the Tax Court was right in considering this unreported amount in determining the taxable income.

### B. *The Taxpayer's Business Activities*

Before considering the other two items, certain facts culled from the record should be referred to.

The taxpayer has resided in the City of Hawthorne, California, since 1924. He came from Oklahoma where he was born in 1903. While he claimed that he had saved two or three thousand dollars while working in Oklahoma, there was no positive evidence produced to show how he accumulated the money on the small salary he received. After working as a fireman he began to work for the Police Department of Hawthorne in 1930. He became Chief of Police in 1937,—a position he occupied until retirement in June, 1953. Joint returns were filed for all years except 1945 and 1947 for which years separate returns were filed. His work for the City of Hawthorne began in 1925. At that time he evidently worked for a brief period only, for his income from the City was $45. In 1926, his income was $1,770. He received no income from the City of Hawthorne in 1933, his services having been terminated on October 24, 1932. But he was rehired May 14, 1934. In 1944, his salary was $2,820.07. From then it rose until in 1951 when it was $6,061.70. Prior to 1942, the taxpayer had paid no income tax. Indeed, he did not file income tax returns for the years 1930 to 1939 inclusive. For the years 1940 and 1941, he filed returns showing no tax.

Other facts which have special significance should also be referred to. They are given with slight modification in the form in which they appear in the Findings of the Tax Court. For, in the main, they are not disputed.

In June of 1937, the taxpayer applied to the Bank of America for a loan of $200 to pay off another obligation with the

---

12. Davis v. Commissioner, supra Note 11, 239 F.2d at page 189.

bank which then had a balance of $65.98 and to take care of funeral expenses of $140. This loan was rejected. On the loan application, which was signed by the taxpayer, appears the information that there was at this time $250 owing by the taxpayer to Acme Loan which was being paid off in monthly installments of $32.08, $105 owing to Inglewood Furniture which was being paid off in monthly installments of $5 and $70 owing to Federal Outfitting Company which was being paid off in monthly installments of $4. On this application, the taxpayer listed *no other income or no source of income other than from the Police Department, although the application specifically asked for this information,* under the typed headings "other income" and "source of other income". The application was filled out in handwriting (print). Through the two items a line was drawn indicating that it was a deliberate omission. The same pattern is found in other applications.

In April of 1938, the taxpayer applied to the Bank of America for a personal loan of $200 for the purpose of taking a vacation trip to Oklahoma. On the loan application, which was signed by the taxpayer, appears the information that petitioner owed $40 to the Marbro Department Store which was being paid off in $5 monthly installments and also owed $40 to the Inglewood Furniture Company which was being paid off in monthly installments of $5. On this application the taxpayer listed *no income or source of income other than from the Police Department,* although the loan application *specifically asked for such information.*

In January of 1939, the taxpayer negotiated a loan of $480.30 from the Bank of America to refinance a used 1938 Chevrolet and contracted to make payments of $32.02 per month. On the purchase statement signed by the taxpayer he listed as income only a salary of $185 per month and listed nothing under *"other income" or "source of other income."*

In an application for a loan on property in July, 1941, signed by the taxpayer and his wife, their total annual income was stated *to be $2,400.*

An analysis of the records of the Bank of America, where the taxpayer carried accounts, made by a special agent engaged in the investigation leading up to the deficiencies herein, showed little activity, no large balances and no large deposits or withdrawals during the years 1940 to 1944, inclusive.

The taxpayer kept no records of real estate transactions, the poker club income, rentals, interest, dividends or "commissions", the latter being reported on returns for 1947, 1948 and 1949 in amounts of $2,000, $3,000 and $6,000 respectively.

The taxpayer received interest income during the taxable years from savings accounts, trust deeds and a note in the following amounts:

| 1944 | $ 115.03 | 1948 | $ 904.09 |
|------|----------|------|----------|
| 1945 | 768.77 | 1949 | 705.11 |
| 1946 | 1093.39 | 1950 | 626.18 |
| 1947 | 929.74 | 1951 | 530.53 |

Most of this interest was collected by a bank and credited to the taxpayer's account. It was not reported on the tax returns.

During 1949 taxpayer received $1,550 in rentals. Of this sum $1,250 was paid by the tenant to a bank and credited on taxpayer's account. The remainder was paid to the taxpayer by check. These amounts were not reported on the tax return for 1949.

The taxpayer received dividend income in the years 1943 to 1948, inclusive, and in 1951 amounting to a total of $170, which were unreported on the tax returns for those years.

The taxpayer was entitled to a distributable share in the amount of $1,116.-54 in 1951 from the profits of the card club in which he was a limited partner. He did not report this amount on his tax return.

The taxpayer sold two properties in 1944 reporting a gain on his income tax return of $430 on one piece and $780 on

the other. These sales actually resulted in gains of $4,527.28 and $2,136.26, respectively. In 1945 another piece of property was sold on which there was a reported gain of $2,257. The actual gain was $5,359.05.

### C. The Tax Court's Determination of Deficiencies

The Commissioner determined the tax liability of the taxpayer for all taxable years in question by the net worth method with the exception of the taxable years 1944 and 1949 in which the deficiency determination was based upon specific items of unreported income.

By taking into account the disparity between the amounts shown on the income tax returns and the actual amounts received, the Tax Court determined the following deficiencies and penalties for the taxable years mentioned:

Milford R. Baumgardner

| | Tax Deficiency | Penalties §293(b) | §294(d) (2) |
|---|---|---|---|
| 1945 | $856.96 | $428.48 | $ 55.98 |
| 1947 | | 158.08 | 19.35 |

Milford R. Baumgardner and Pearl E. Baumgardner

| | Tax Deficiency | §293(b) | Penalties §294(d) (2) | §294(d) (1) (A) |
|---|---|---|---|---|
| 1942 | $ 647.54 | $ 323.77 | | |
| 1944 | 886.93 | 443.47 | | |
| 1948 | 2,954.28 | 1,477.14 | $215.86 | $323.78 |
| 1949 | 326.88 | 163.44 | 78.22 | |
| 1950 | 5,426.42 | 2,713.21 | 334.68 | 577.80 |
| 1951 | 1,434.62 | 717.31 | 104.62 | 174.36 |

In arriving at the conclusion just stated the Court had before it, in addition to oral testimony, a schedule of assets and liabilities prepared by the Government agent who investigated the matter and which showed the following figures between December 31, 1940 and December 31, 1951:

| | Total Assets | Total Liabilities | Net Worth |
|---|---|---|---|
| 1940 | $ 11,137.15 | $ 1,778.48 | $ 9,358.67 |
| 1941 | 12,988.81 | 2,620.96 | 10,367.85 |
| 1942 | 14,519.91 | 246.15 | 14,273.76 |
| 1943 | 15,219.48 | | 15,219.48 |
| 1944 | 21,679.44 | | 21,679.44 |
| 1945 | 34,434.66 | | 34,434.66 |
| 1946 | 43,129.80 | | 43,129.80 |
| 1947 | 51,283.18 | | 51,283.18 |
| 1948 | 74,875.44 | 7,500.00 | 67,375.44 |
| 1949 | 77,817.99 | 7,220.87 | 70,597.12 |
| 1950 | 101,345.31 | 10,000.00 | 91,345.31 |
| 1951 | 108,977.16 | 10,853.89 | 98,123.27 |

This analysis was based upon a thorough examination of bank accounts, bank loan records, records of income tax returns filed, bank escrow files, payroll records of the City of Hawthorne, City of Hawthorne bond records, record of tax lien sales, grantor-grantee indices for Los Angeles County and trust deeds and mortgages thereon. On the basis of his conclusion the Commissioner allowed only $100 as cash on hand at the beginning of the net worth period, December 31, 1940, which was carried over through 1951. The Tax Court increased this amount to $5,000. The taxpayer's chief complaint seems to be that if the Tax Court believed that he had more cash than the agent allowed him, they should have given him credit for the total sum of $14,000 or $16,000 which he claimed to have accumulated from dealing in depreciated improvement bonds of the City of Hawthorne. The argument is a *non sequitur*. The Tax Court may believe a portion of a witness' testimony and not believe another. As there is no hard and fast rule requiring that the cash on hand at the beginning of the net worth period be proved with mathematical certainty, the Tax Court may reject an estimate made by an agent in a net worth case in favor of one of its own.[13]

This happened in the case just referred to. The Commissioner had determined that the cash at the beginning of the net worth period was $15.03. However, the Tax Court raised the amount to $100,000.

Not satisfied, the taxpayer contended before the Court of Appeals, *as it is contended here,* that the figure was arbitrary and that the Tax Court should have accepted his testimony that he had cash in the sum of $259,000, because *it had not been rebutted by the Commissioner.* Rejecting the contention, the Court said:

"We think the Tax Court was generous to taxpayer in fixing $100,000 as the amount of cash on hand at the beginning of the net worth period, but under the Cohan rule such determination was proper. It is the function of the trier of the fact to weigh all the elements properly considered in the valuation and to translate them into dollars and cents. * * * Nor is it essential that there be testimony of the specific figure fixed by the Tax Court."[14]

Such situations are not uncommon. The Tax Court has, on other occasions, reduced deficiencies while retaining the penalties for fraud.[15]

*D. Taxpayer's Claim as to Source of Increase*

The taxpayer's salary as a motion picture operator before coming to California from Oklahoma, for a period of three or four years, never exceeded $45 per week. So small an income does not account for an accumulation such as claimed by him, to use his own words, "of $2,000 or $3,000, maybe $4,000", which he claims to have brought to California in 1924. His chief contention is

---

13. Bodoglau v. Commissioner, 7 Cir., 1956, 230 F.2d 336.

14. Bodoglau v. Commissioner, supra Note 13, 230 F.2d at page 340. Even a criminal conviction has been sustained when, although the evidence as to opening net worth was based on admissions which were not corroborated, there was indirect proof in the record of its correctness. United States v. Calderon, supra, note 9, 348 U.S. at page 169, 75 S.Ct. 186. In another criminal prosecution, the Court answered the contention that the starting net worth figure was uncertain in this manner:

"It is said that the agents did not establish a starting point with reasonable certainty and in fact had no way of knowing the exact amount of the assets and liabilities of the defendant either at the beginning or end of the year. In this respect, however, the quality of the proof offered by the Government did not differ materially from that usually employed in criminal prosecutions when the Government is forced to estimate the net worth of the defendant because he has failed to keep or refuses to produce records of his business." Beard v. United States, 4 Cir., 1955, 222 F.2d 84, 89. See, Traum v. Commissioner, 7 Cir., 1956, 237 F.2d 277, 280–281; Latendresse v. Commissioner, 7 Cir., 1957, 243 F.2d 577, 580.

15. Kurnick v. Commissioner, 6 Cir., 1956, 232 F.2d 678.

that the Tax Court should have taken at its face value his assertion that he made from $12,000 to $16,000 in purchasing at depressed value improvement bonds of the City of Hawthorne, later selling them at higher prices or face value.

Briefly, the facts relating to the improvement bonds are these: Early in 1930 the City of Hawthorne was in difficulty because a substantial part of its real estate had been removed from its tax rolls because of the default of special assessment bonds issued under state law.[16] The City arranged for a refunding of the bonds. This was achieved through the firm of Crowell, Weedon & Co., an investment house in Los Angeles. Mr. Tad Traverse was connected with the firm. He testified that, at various times, he held meetings with the heads and members of the various departments of the City, such as the Police Department, Fire Department, Water Department, Street Department, for the purpose of going over in detail the problems of the City and explaining the methods developed to refund delinquent special assessment bonds and restore the property to the tax rolls. Crowell, Weedon & Co. and Traverse bought some of the bonds which were selling for as low as ten, twelve or fourteen cents on the dollar. The City, under the statute, was obligated to pay them off at par at maturity.[17] There were several (probably thirty) series of bonds due at various times. All were bearer bonds and freely transferable. It was the testimony of the taxpayer that between 1932 and 1933, he bought some of these bonds and from their sale he made a profit of $12,000 to $16,000 and had that amount of cash on hand at the beginning of the net worth period.

The testimony as to the whole transaction is vague. To his own counsel's question as to the profit he made on the bonds, his answer was:

"A. $12,000, $13,000, $15,000 maybe $16,000".

He kept it at home because, as he put it, "my experience as a controversial person in the City of Hawthorne is that you were always subject to a lawsuit because of false arrest or something you had done wrong, so I kept it at home."

The purchases were supposed to have been made between 1934 and 1939. There is no showing how they were purchased,—with cash or checks. Nor is there a showing what series they were, when or where they were sold and to whom or at what specific profit. Nor is there any showing that any of them were presented to the City of Hawthorne for *redemption at par*. The money was kept at home, at times under a rug and at other times in a money belt. When the taxpayer went on vacations he left his "hoarded" money at home. He took it with him when he moved from one house to another but "did not count it". It is to this money, claimed to have been reinvested profitably, that the taxpayer sought to trace the increase in his net worth. While the Tax Court gave credence to some of this testimony and to that of the corroborative witness, Tad Traverse, it may be stated with frankness that, from the cold record one gathers the definite impression that Mr. Traverse added little convincing strength to the taxpayer's unusual tale. After testifying, as already noted, as to the discussions with various officials of the City of Hawthorne about the City's financial situation, he stated that beginning in 1933, he discussed with the taxpayer the purchase of bonds, and that he bought some for him. He expressed himself in this rather nebulous fashion about the amount:

"Well, it wasn't of any great material amount such as $200,000.00 or so. If it were it would have registered. The best way I could answer

---

16. California Streets and Highways Code, § 6400 et seq. And see, §§ 6500 to 6517 relating to default and sale for delinquency, and §§ 6530 to 6532 relating to redemption of delinquent property.

17. California Streets and Highways Code, § 6424.

that question is to say it would be a limited amount, maybe some place between $15,000 to $35,000. When I am speaking of $25,000 or $35,000, I am speaking of the par value of these bonds which are seven per cent coupon tax exempt bonds, and while that was due and payable by the City, the market value of these bonds at that time, they were selling at ten cents, twelve cents and fourteen cents on the dollar, so I am referring to the amount as $25,000.00 or $15,-000.00 or $30,000.00 or $35,000.00, and I am quoting from my memory.

"Q. By Mr. Bouchard: I understand. A. But the amount I am referring to is the principal amount, which is the obligation to be paid, not the market value."

In order to realize the profit claimed by the taxpayer, either a larger number would have had to be purchased or he would have had to resell them at high profit or redeem them at par. He testified that some of the bonds were paid off at par and accrued interest. How many he did not tell. And it was stipulated that

"the names of M. R. Baumgardner and Pearl E. Baumgardner do not appear on the City of Hawthorne bond records for the years 1925 to 1951, inclusive."

Although the witness Traverse was connected with a known investment house which acted as fiscal agent for the City of Hawthorne, he produced no record of theirs or his to show the amount of the sales, the commissions charged or any data from which a definite inference could be drawn as to the precise extent of the transactions alleged to have been carried on by him for the taxpayer.

The taxpayer's wife shed little light on the subject. She is California born. She and the taxpayer were married on August 20, 1926 and have two children, a son now 25, a daughter 20. She did not know how much money her husband had when they were married,—only knew "that he had some". She told the Government agent that "she never saw the money". The taxpayer's testimony was that he kept bills of large denomination, —$20, $50 and $100 bills. To the agent the wife stated:

"that she did not think her husband was telling the truth, because she never saw any large amounts of cash, certainly never as much as $18,000.00, maybe $1,000.00, but not such a large amount as $18,000.00." (Emphasis added.)

At the trial, she denied making this statement. She claimed she saw money under the rug, behind pictures and in tobacco cans in 1932. She could not identify any specific amount, although she claimed that she saw the money when she cleaned under the rug. The following interesting colloquy occurred:

"Q. Do you know whether or not in any period in the thirties or the forties, if Mr. Baumgardner kept any amounts of money at home? A. Yes.

"Q. Do you know how much he kept there? A. No.

"Q. Do you know whether it was much or little? A. Well, I think sometimes he had quite a little bit.

"Q. Do you know where he kept it? A. Well, yes.

"Q. Well, where? A. Well, behind pictures and under the rug.

"Q. Now, do you remember any occasion of any substantial amount of money being taken from under this rug? A. Well, one occasion was when some friends of ours whom we ran around and went to school with, she was expecting her baby and I believe it happened on a Sunday and Johnny came to our house on the Sunday morning and asked Jack if he could loan him any money for the hospital and he would give it back to him as soon as he could get to the bank, and I believe at that time, that Jack took it out from under the rug because it has always been a joke with these people and ourselves that, 'If you want any money you can always get it under

the rug at Jack's house'." (Emphasis added.)

Maternity cases for hospitals are routine. And a Sunday loan to a friend for a hospital advance deposit to be repaid when the banks opened, *presumably the next day*, could not have been very large. No other witness was produced who saw the taxpayer take any sum of money from his hoarding places or belt.

It is inconceivable that a public official should have concealed over the years large amounts of money merely because he feared suits might be instituted against him. After all, he had the right to believe that the City which employed him would assume responsibility for his official acts, or, at least, defend him in any action brought against him arising from his police activities. His marital life seemed to have been a happy one, and he was not concealing any money from his wife, as happened in the criminal case to which counsel called attention at the argument.[18]

In sum, the testimony in this record as to the hoarded money is so replete with situations that go counter to common experience and the usual tests of verity that the Tax Court *would have been justified in rejecting it in its entirety*, absent documentary corroborative proof. As it is, they allowed the taxpayer as cash on hand at the beginning of the tax period the sum of $5,000, which,— to use the language of one of the cases cited, was "generous" indeed.[19]

It seems to be assumed that once the taxpayer indicated a non-taxable source of increase in net worth, it became the duty of the Government *to accept it at its face value or negate it*. The cases already referred to indicate clearly that the tax authorities are not required to accept the taxpayer's explanation of his net worth increase.[20] And even in criminal cases, the rule is that

"where relevant leads are not forthcoming, the Government is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the defendant."[21]

██ The net worth method is not a system of accounting. It is merely indirect evidence of income. When the declared income and non-taxable receipts and increases in value do not account for the taxpayer's net worth increase over a period of years, the method is resorted to in order to show that the increase is due to undeclared taxable income. In the case before us, the Government agent followed all the leads that were given to him by the taxpayer. Some of the omissions to declare interest and failures to account for gains have already been alluded to. The Tax Court *was willing* to accept in part the taxpayer's claim of alleged profits from buying and selling improvement bonds. It *was not required* to accept it in full.

---

18. Fairchild v. United States, 5 Cir., 1955, 240 F.2d 944.

19. Bodoglau v. Commissioner, supra note 13, 230 F.2d at page 340.

20. See cases cited in notes 13, 14 and 15.

21. Holland v. United States, 1954, 348 U.S. 121, 138, 75 S.Ct. 127, 137, 99 L. Ed. 150. See, Blackwell v. United States, 8 Cir., 1957, 244 F.2d 423, 428; Kampmeyer v. United States, 8 Cir., 1955, 227 F.2d 313, 317. As stated in another case *(a civil tax case)*:
"Regarding the alleged over-ceiling payments for food and wages, there is

only the self-serving testimony of Williams. *It is uncorroborated by any receipts, checks or other documentary evidence. None of the recipients of the contended for over-ceiling payments was produced. Since the taxpayers failed to furnish the investigating Internal Revenue agents the information regarding the claimed over-ceiling payments, the government was under no obligation to negative this exculpatory evidence.* Cf. Holland v. United States, 1954, 348 U.S. 121, 135–136, 75 S.Ct. 127, 99 L.Ed. 150." Masters v. Commissioner, 3 Cir., 1957, 243 F.2d 335, 338.

## IV.

### The Finding of Fraud

#### A. Proving Fraud

▉ The Tax Court sustained the penalties imposed against the taxpayer.[22] All these penalties, except those for the years 1950 and 1951, would be barred, unless there was fraud, in which event the statutes of limitation do not apply.[23] The burden of proving fraud before the Tax Court is upon the Commissioner.[24] The attitude of the Federal Courts of Appeals in determining the quantum of proof necessary to sustain a finding of fraud, following the decision of the Supreme Court in Holland v. United States,[25] is well summed up by the Court of Appeals for the Sixth Circuit:

> "The question whether an understatement of income is due to fraud is a question of fact. While fraud is never presumed but must be established by clear and convincing evidence and there must be an intention to defraud, Kashat v. Commissioner of Internal Revenue, 6 Cir., 229 F.2d 282; Drieborg v. Commissioner of Internal Revenue, 6 Cir., 225 F.2d 216; Section 1112, Internal Revenue Code, we think this burden is clearly sustained by the discrepancies between real net income and reported income for so many years. Consistent, substantial understatements of income for several years, as was true here, is highly persuasive evidence of intent to defraud the government. Rogers v. Commissioner of Internal Revenue, 6 Cir., 111 F.2d 987. See also Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 137, 99 L.Ed. 150, which held that 'evidence of a consistent pattern of underreporting

large amounts of income' will support 'an inference of willfulness.' "[26] Other Courts of Appeals have expressed the view that discrepancy between real and reported income for a number of years alone is strong evidence of an attempt to evade taxes which satisfies the "clear and convincing" concept and warrants the imposition of fraud penalties.[27]

#### B. Disparity Between Income Declared and Income Found

The following comparative table shows the great disparity between the reported income and the income determined by the Tax Court:

| | Income Reported | Income determined under Rule 50 of the Tax Court |
|---|---|---|
| 1942 | $ 2,630.76 | $ 5,821.02 |
| 1944 | 3,505.07 | 7,179.08 |
| 1945 | 2,372.75 | 6,037.82 |
| 1947 | 2,955.91 | 4,679.19 |
| 1948 | 7,721.02 | 19,952.17 |
| 1949 | 10,436.47 | 11,865.13 |
| 1950 | 4,996.29 | 27,062.23 |
| 1951 | 6,132.95 | 12,071.07 |

In addition to this we have failure to keep books, admitted failure to report interest received in every taxable year on review with the exception of 1942, amounting to a total of $5,672.84, and dividend income from 1943 to 1948, inclusive, and 1951, amounting to a total of $170, failure to include the profit from partnership interest in the card club for 1951, failure to include earned rentals in 1949, amounting to $1,550. If to this we add capital gains realized on sale of real estate in the year 1944, amounting to $8,207.96 with an amount reported of $1,210, a gain of $5,359.05 realized in

22. Internal Revenue Code of 1939, 26 U.S.C., 1952 Ed., §§ 293(b); 294(d) (2); 294(d) (1) (A).

23. Internal Revenue Code of 1939, 26 U.S. C., 1952 Ed., §§ 275, 276(a).

24. Internal Revenue Code of 1954, 26 U.S.C., 1952 Ed., Supp. II, § 7454.

25. Holland v. United States, supra note 21.

26. Kurnick v. Commissioner, 6 Cir., 1956, 232 F.2d 678, 681.

27. Hargis v. Godwin, 8 Cir., 1955, 221 F. 2d 486, 487, 490; Bodoglau v. Commissioner, supra, note 13, 230 F.2d at page 341; Romm v. Commissioner, 4 Cir., 1957, 245 F.2d 730, 734. See, Davis v. Commissioner, 7 Cir., 1956, 239 F.2d 187, 190; Schira v. Commissioner, 6 Cir., 1957, 240 F.2d 672, 674.

1945 with only $2,257 reported, and the failure to make full or detailed report on alleged "commissions" received for private investigation in the taxable years 1947, 1948 and 1949, or to *disclose the names of persons from whom he received them*, and the total omission of such commissions in the taxable years 1950 and 1951, we have an accumulation of facts (all, except the dividend item, relating to substantial yearly transactions) justifying the finding of fraud. The agent testified that the taxpayer would not give details as to the commissions, *for verification*,

"because if it became known he would lose his job and he said that although he trusted me, he was sure that there was a leak in the Internal Revenue service since his income tax matters were introduced by his opposition during litigation."

The taxpayer admitted that he refused to disclose to the agent the names of the persons from whom the "commissions" were received (not in the form attributed to him by the agent) because "it might cause him trouble". He explained:

"The City of Hawthorne states that no employee shall receive wages or moneys other than their wages unless you have permission of the Civil Service Commission and the Council of the City of Hawthorne."

 He did not disclose to his own accountant who prepared some of the returns the source of the "commissions". He asked that they be listed as "other income". The accountant designated them as "commissions". Nor did he tell him what the figures were composed of or produce any document to support them. He tried to minimize the logical inferences to be drawn from receipt of such "commissions" from undisclosed persons by a Police Chief for what he ad-

mitted to be "unauthorized" private investigations by stating that he included in his return

"More than enough, yes, sir. I thought I was being very fair,"

and that the commissions were

"Any moneys I might receive during the year for interest, for gratuities or anything that might come along, other than my salary."

From this and other admitted facts, and the manner in which he and his witnesses testified, the Tax Court was justified in drawing its own inferences. For they had evidence of (1) the deliberate understatement of income, (2) failure to disclose over a course of years income known to have been received, (3) refusal to disclose sources of admitted income, for verification, (4) deliberate underestimate of gains and (5) evasiveness and contradiction in attempting to explain sources of income and discrepancies both to the agent and the court,—all the indicia of fraud which courts have recognized as adequate in imposing penalties.

Except as to the matters herein discussed and in dispute before the Tax Court, the net worth statements prepared by the Government's agents were concededly correct. And the Tax Court so found them to be, except that it increased the opening net worth figure at the beginning of the net worth period from $100 as found by the agent to $5,000.

When to these facts we add the thorough but, in most instances, fruitless search by Government agents for nontaxable sources to account for the substantial net worth increases, we have in this record substantial evidence to satisfy the most rigid requirements as to proof of fraud cases of this character.[28]

The Tax Court was right in its decision. It is affirmed.

28. Author's Note: The conclusion reached is reinforced by the decision of the Supreme Court in United States v. Massei, 78 S.Ct. 495, in which the Court, in commenting on the quantum of proof under Holland v. United States, supra Note 21, and the decision of the Court of Appeals in which the Court had stated that it regarded proof of likely source to be an indispensible element of the net worth method, said:

"In Holland we held that proof of a likely source was 'sufficient' to convict in a net worth case where the Government did not negative. all the possible nontaxable sources of the alleged net worth increase. *This was not intended to imply that proof of a likely source was necessary in every case.* On the contrary, should all possible sources of nontaxable income be negatived, there would be no necessity for proof of a likely source."