LOUIS NADELL and MARY NADELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nadell v. Commissioner
Docket No. 1996-72
United States Tax Court
T.C. Memo 1974-227; 1974 Tax Ct. Memo LEXIS 94; 33 T.C.M. (CCH) 1005; T.C.M. (RIA) 74227; August 29, 1974 Filed Stephen E. Silver, for the petitioners. Dennis C. DeBerry, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and fraud penalties under section 6653(b) [1] as follows: Year
Deficiency
Fraud Penalty
1968
$ 8,146.32
$ 4,073.16
1969
8,555.01
4,277.50
1970
11,181.51
5,590.75
Total
$27,882.84
$13,941.41
The issues presented are: 1. By how much did *95 petitioners understate their income for the years in issue (petitioners concede some understatement)? 2. To the extent that there was an underpayment of tax, was it in part or in whole due to fraud? FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Louis and Mary Nadell are husband and wife, and were residents of Phoenix, Arizona at the time the petition in this case was filed. They filed joint Federal income tax returns for 1968, 1969 and 1970 with the district director in Phoenix, Arizona. Henceforth, "petitioner" will be used to designate Louis Nadell. At the time of trial petitioner was 70 years old. He was born in Lithuania and immigrated to this country in 1922. In 1927 he moved to Canada. In 1948 he returned to the United States and since then has resided continuously in Phoenix. Although not literate in English, petitioner can both read and write Yiddish, can read some English, can read numbers, and can add and subtract. He has one son who at the time of trial was in his last year of medical school in Denver, Colorado. Petitioner paid at least some portion of his son"s educational expenses, and claimed him as a dependent. *96 During each of the years 1968, 1969 and 1970, petitioner was self-employed, characterizing himself as a "junk peddler." He engaged primarily in buying used "trade-in" and junk batteries from service stations and auto parts stores and reselling them to the Fire King Battery Company, hereinafter "Fire King." Petitioner also occasionally cleaned up yards to make a little extra money. Additionally, he received rental and interest income. Petitioner periodically canvassed service stations and auto parts stores in the Phoenix area to obtain batteries for resale to Fire King. Moreover, petitioner had an oral contract with the Checker Auto Part Stores ("Checker") whereby they agreed to sell all of their used and junk batteries to petitioner. Checker was petitioner's major source of batteries, supplying on the average not less than 400 per week. Petitioner paid Checker an average of 15" more per battery than his other suppliers. Petitioner normally began his day at six in the morning by picking up his helper, who would assist him in loading and unloading the batteries from the flatbed pick-up truck petitioner used in his business. Generally he would finish working in the early afternoon *97 when the day's load of batteries was delivered to Fire King. Upon occasion petitioner made two deliveries in one day. Petitioner worked five days a week, Monday through Friday. Petitioner kept no books and records of his purchases and sales of batteries. He always paid his suppliers in cash, as was the custom in the junk peddling business. The cash came from a supply of one dollar bills which he kept in a brown paper bag. Similarly, petitioner always received payment in cash in a brown paper bag from Fire King. The price at which petitioner would buy batteries, as well as that at which he would sell to Fire King, would vary due to fluctuations in the lead market. He kept no records of the salary paid to his helper or the expenses associated with the operation of his truck, utilizing cash for these purposes also. Petitioner's income tax returns for the years in issue were prepared by Mr. Rosen, who used estimates petitioner's son recorded based on petitioner's oral directions. Prior to April 1, 1969, Fire King was operated as a partnership by John Romanesky and William Krebs, each of whom had a one-half interest. From April 1, 1969 to October 1, 1969 John Romanesky and his *98 wife J. Eloise Romanesky (hereinafter "the Romaneskys") operated Fire King as a proprietorship. Since October 1, 1969, Fire King has been an Arizona corporation with the Romaneskys its sole stockholders. During the years in issue Eloise Romanesky had control of the books and records of Fire King. She had a prior background in accounting, having studied the subject in college. In late April 1971 a revenue agent was assigned to audit the corporate income tax return filed by Fire King for the taxable year ending September 30, 1970. The revenue agent's initial contract with Fire King was made by telephone on April 30, 1971. During the conversation, John Romanesky requested the revenue agent to contact Fire King's independent accountant, Robert P. Gehrandt. On or about June 9, 1970, the books and records of Fire King were made available to the revenue agent at Mr. Gehrandt's office. Shortly after the audit began, the revenue agent requested further explanation regarding the large number of checks drawn to "cash" which were charged to the purchase of junk batteries. He was told that these checks represented amounts paid in cash to the petitioner for the purchase of batteries. He *99 was also informed by Fire King that petitioner never signed any receipts for the payments, although one part of a two-part receipt was given to petitioner after each delivery. On or about June 16, 1971 the revenue agent requisitioned petitioner's 1970 tax return. On August 10, 1971, the revenue agent sent a letter to petitioner informing him that his 1970 Federal income tax return was under scrutiny and requested an opportunity to examine the books and records incident to his junk battery business and all bank statements and cancelled checks. On August 16, 1971, petitioner went to the revenue agent's office, taking with him his bank book. He explained to the revenue agent that he kept no books or records of any type in relation to either his battery business or any other source of income. When asked specifically if he sold batteries to Fire King, he replied that he did, but not in any large volume. Immediately after this conference the revenue agent requisitioned petitioner's 1969 tax return. Nine days later petitioner's 1968 return was requisitioned. On September 14, 1971, the revenue agent formally referred the Nadells' case to the Intelligence Division of the Internal Revenue *100 Service. On September 7, 1971, petitioner closed out a safety deposit box that he had rented on a yearly basis since September 8, 1969. Over the course of the two years, petitioner, his wife or son visited the box a total of five times. On October 8, 1971, the revenue agent called petitioner and was referred to petitioner's attorney. Subsequently petitioner's attorney met with the revenue agent, but provided no information concerning his client's business. The books and records of Fire King show that during the years 1968, 1969 and 1970 Fire King received the following numbers of batteries from petitioner and paid the following sums of money in cash to petitioner: 1968 Number of Batteries Shown Received from Louis Nadell
Amount of Cash Shown Paid to Louis Nadell
Jan.
4,520
$7,909.25
Feb.
2,848
4,984.00
Mar.
3,486
6,109.00
Apr.
3,529
6,050.80
May
3,374
5,250.40
June
3,762
5,973.30 July
4,782
7,289.05
Aug.
4,761
6,697.40
Sep.
4,070
5,698.70
Oct.
6,017
8,428.85
Nov.
4,598
6,440.40
Dec.
5,013
7,009.80
Total
50,760
$77,840.95
1969
Jan.
4,703
$ 6,694.65
Feb.
3,893
5,849.90
Mar.
3,802
5,703.00
Apr.
3,875
5,825.00
May
3,833
6,097.50
June
4,714
7,624.60
Jul y
4,874
8,377.40
Aug.
5,296
9,276.50
Sep.
1,640
2,870.00
Oct.
5,645
10,125.00
Nov.
4,202
7,336.50
Dec.
5,126
9,694.50
Total
51,603
$85,474.55
1970
Jan.
4,170
$ 8,157.30
Feb.
3,570
7,008.80
Mar.
3,112
6,178.20
Apr.
3,349
6,595.95
May
2,783
5,578.50
June
5, 290
10,455.15
July
5,673
11,090.30
Aug.
5,401
9,739.75
Sep.
5,457
8,974.65
Oct.
4,939
7,587.40
Nov.
4,492
6,893.35
Dec.
5,197
7,827.15
Total
53,433
$96,086.50
*101 Petitioner received the amounts shown to have been paid him on the books of Fire King. Besides petitioner, Fire King had four other sources of junk and "trade-in" batteries: (1) trade-in batteries sometimes received when a new or reconditioned battery was sold; (2) junk batteries purchased upon occasion from individuals who were not generally in the junk battery business; (3) batteries purchased from other junk peddlers; and (4) direct purchases from car dealers and other who had accumulated a quantity of junk and used batteries. Fire King did not set up an inventory of junk and used batteries. Faced with the conflicting stories of petitioner and the Romaneskys concerning both the number of batteries Fire King bought from petitioner and at what price, the respondent issued statutory notices of deficiencies against Fire King and its principals. These statutory notices were based on theories alternative to and inconsistent with the theory respondent asserts in this case. At the time of the trial of this case, the proposed deficienceis were in docketed status before this Court. On or about December 1, 1972, petitioner filed a complaint in the Superior Court of the State of Arizona, *102 in and for the County of Maricopa, against Fire King, Inc., the Romaneskys and the Krebs, praying for substantial actual and punitive damages in excess of $100,000 on a theory of injurious falsehood based upon the facts which are in controversy in this proceeding. The defendants in the suit filed similar counterclaims. OPINION 1. Understatement of Income. Petitioner admits he had understated his income in each of the years in issue, but contends that the understatement is much less than respondent asserts. The question we must decide is by how much petitioners understated their income for the years 1968, 1969 and 1970 on their joint returns. The net profits reflected on petitioners' return for the sale of used batteries, the amounts now admitted received, and the net profits respondent contends petitioners received, are as follows: Year
Shown on Returns
Now Admitted
Respondent's Contentions
1968
$2,043.57
$5,053.57
$ 24,302.20
1969
1,489.87
4,389.87
23,790.05
1970
649.84
5,149.84
29,779.50
Total
$4,183.28
$14,593.28
$77,871.75
The trial of this case was rife with direct contradictions in testimony. According to the Romaneskys, *103 the owners of Fire King, up to three hundred batteries were delivered by petitioner per trip; petitioner maintains that his truck was physically incapable of carrying many more than one hundred fifty batteries. The Romaneskys claim that they asked petitioner to sign receipts but he refused to do so; petitioner denies ever being asked to sign anything. The Romaneskys claim that they always gave receipts to petitioner; petitioner declares that he never received such receipts. The Romaneskys claim that petitioner was generally paid for each day's delivery on the following day; petitioner steadfastly contends that he was always paid immediately after each delivery. The Romaneskys claim that they would comply with petitioner's occasional request for the payment to include one or two $100 bills mixed in with one dollar bills; petitioner denies ever making such a request or receiving any one hundred dollar bills, and furthermore asserts that perhaps the Romaneskys "skimmed" hundred dollar bills in a fraudulent scheme to inflate Fire King's costs with a view to exculpate themselves at his expense in the event of detection. There were other witnesses less self-interested in the outcome *104 of this trial than petitioner and the Romaneskys. James A. Slopper, a former helper on petitioner's truck during the years in issue, testified that petitioner had two trucks, the larger having an approximate capacity of 250 batteries. He also testified that on a good day 175 to 200 batteries would be delivered to Fire King. Delmer Wayne Dickerson, the shop foreman at Fire King, testified that the average delivery was 150 batteries, that on many occasions petitioner would deliver over 200 in a single trip, and that a load of approximately 300 occurred at least once. Petitioner admitted single deliveries of "up to" 150 batteries per day, five days a week, or up to 39,000 batteries per year, approximately 80 percent of the amount that Fire King claims he delivered each year. Dickerson also corroborated the Romaneskys' claim that Fire King would always give petitioner a receipt. He testified that many times he personally made the purchase for Fire King, filled out a receipt in duplicate indicating both the number of batteries and the amount of money that was paid, and paid petitioner in one dollar bills in a brown paper bag. The original receipt was given to petitioner; the carbon *105 was retained by Fire King. Robert P. Gehrandt, advisor, accountant and bookkeeper to Fire King, testified that he had met petitioner at the Fire King store, had observed him being paid in one dollar bills in a brown paper bag, and had seen petitioner receive a receipt. He also testified that while driving in Phoenix he had observed petitioner's truck piled so high with batteries that he was afraid that a battery would drop off. Petitioner points out that both Dickerson and Gehrandt are long-time employees of Fire King and that the former is covered by the company's profit sharing plan. From this we are asked to infer that their testimony was as false as petitioner paints that of the Romaneskys. We do not make this inference. Having both considered the extent of these witnesses' motive to lie and observed their demeanor on the stand, we find them to be credible. The same, unfortunately, cannot be said for petitioner. WE conclude and have found as a fact that the Fire King records accurately reflected the number of batteries sold by petitioner to Fire King. The question of the amount of profit realized by petitioner on the sales remains. The Commissioner's determination *106 of taxable income is presumptively correct, (U. S. Tax Court, Rule 142), and "when the taxpayer has defaulted in his task of supplying adequate records, he is not in a position to be hypercritical of the Commissioner's labor." Webb v. Commissioner, 394 F. 2d 366, 372 (C.A. 5, 1968), affirming a Memorandum Opinion of this Court. In this case, the Commissioner's labor was necessarily inexact.The revenue agent calculated petitioner's cost of junk and used "trade-in" batteries based on a survey of 29 service stations and auto parts stores in the Phoenix area. In accordance with the data so gathered, a cost of $1.25 was assigned to batteries if Fire King paid petitioner $1.75 or over; a cost of $1.00 was assigned for batteries if Fire King paid $1.50 to $1.74; and a cost of $.75 was assigned for batteries for which Fire King paid $1.25 to $1.49. This was set up on a monthly schedule whereby the average unit sales price was determined and the unit cost assigned according to the above formula. In light of the circumstances of this case, respondent's calculation is in general reasonable. However, it fails to take into account the fact, admitted by respondent, that petitioner *107 paid a premium of 15" per battery on those batteries purchased from Checker Auto Parts Stores. Petitioner and respondent agree that at least 400 batteries per week were supplied to petitioner by Checker. Since petitioner failed to prove that any number of batteries greater than 400 was purchased from Checker, we adopt 400 as the basis of calculation. Accordingly, we hold that respondent's calculations of petitioner's income should be modified to reflect an additional cost of sales of 15" per battery for 400 batteries each week, or $3,120 for each taxable year in issue. With this modification, we sustain respondent's determination of deficiency. 2. Fraud Penalty. Respondent contends that petitioner's understatement of income was due to fraud.Petitioner admits he was negligent, but denies he fraudulently understated his income. We find that respondent has established fraud on the part of petitioner. Section 7454(a) [2] places the burden of proving civil fraud on the respondent. Furthermore, this burden must be met by clear and convincing evidence; a mere preponderance of the evidence, ordinarily sufficient in civil matters, will not suffice. [3] Fraud requires willfullness, *108 an "intent to evade tax." [4] This element of scienter is what distinguishes fraud from mere negligence, the lesser failing to which petitioner admits. Always a question of fact, the essential element of a fraudulent state of mind can generally be proved only inferentially by objectively verifiable, telltale indicia. However, despite these obstacles, we find that respondent has met his burden of proof and we uphold the fraud penalty under section 6653(b). Four basic factors, when considered together, lead us to this conclusion. First, petitioner admits substantially and consistently understating his income, and we have found that petitioner has in fact done so to a much greater extent. While cleraly not per se indicative of fraud, it is settled law that "[consistent and substantial *109 understatement of income is by itself strong evidence of fraud." Merritt v. Commissioner, 301 F. 2d 484, 487 (C.A. 5, 1962).[5]
Second, petitioner told the revenue agent that his sales to Fire King were not substantial. Considering the true extent of the transactions with Fire King, the conclusion that petitioner was deliberately lying is unavoidable. Our conclusion would be the same were we to accept the petitioner's admitted understatement. Such an attempt to conceal the truth has obvious probative value. Cf. Ehlers v. Vinal, 382 F. 2d 58 (C.A. 8, 1967). Third, petitioner's failure to keep books and records of any type gives rise to an inference of fraud, particularly in light of the fact that he has failed to produce the receipts that he received from Fire King. E.g., Baumgardner v. Commissioner, 251 F. 2d 311 (C.A. 9, 1957). We are well aware that "[in] determining the presence or absence of fraud the trier of the facts must consider the native equipment and the training and experience *110 of the party charged." E.S. Iley, 19 T.C. 631, 635 (1952). However, while petitioner has a limited educational background in English, the facts remain that he can read English to a limited extent, perform at least simple mathematical calculations, and read and write Yiddish. Thus, petitioner misplaces reliance on the case of Cleveland Thurston, 28 T.C. 350 (1957) where the taxpayer charged with fraud was totally illiterate and unable to perform mathematics of any sort. See, Bollella v. Commissioner, 374 F. 2d 96 (C.A. 6, 1967), affirming summarily a Memorandum Opinion of this Court; Bahoric v. Commissioner, 363 F. 2d 151 (C.A. 9, 1966), affirming a Memorandum Opinion of this Court, and Berstein v. Commissioner, 267 F. 2d 879 (C.A. 5, 1959), affirming a Memorandum Opinion of this Court. Fourth, this Court did not find petitioner to be a credible witness concerning the issue of fraud. He struck us as evasive and disingenuous in his denials. Because these four factors are by themselves sufficiently clear and convincing evidence to sustain a finding of fraud, we need not consider whether certain other, perhaps more *111 ambiguous, bits of evidence should also be interpreted as badges of fraud. For example, we have not calculated the probative value of the fact that petitioner closed out his safety deposit box at a time that coincided with both the expiration of a rental period and with the commencement of the Commissioner's investigation. Nor have we balanced the inherently suspicious practice of dealing only in cash against the admitted fact that the exclusive use of cash was customary in the industry. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue. SECTION 6653. FAILURE TO PAY TAX. * * * (b) Fraud.--If any part of any underpayment *** of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equall to 50 percent of the underpayment. ***↩
2. Section 7454(a) Fraud.--In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary or his delegate. ↩
3. E.G., Eagle v. Commissioner, 242 F. 2d 635 (C.A. 5, 1957); Frank Imburgia, 22 T.C. 1002↩ (1954). 4. Section 7454(a), note 2, supra.↩
5. See also, e.g., Holland v. U.S., 348 U.S. 121 (1954); Bahoric v. Commissioner, 363 F. 2d 151↩ (C.A. 9, 1966).