MATTHEW P. IAUCO AND CAROLYN B. IAUCO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Iauco v. Commissioner
Docket No. 5333-75.
United States Tax Court
T.C. Memo 1982-75; 1982 Tax Ct. Memo LEXIS 667; 43 T.C.M. (CCH) 541; T.C.M. (RIA) 82075; February 16, 1982. *667 In the decades before the years in issue, petitioners held a series of jobs, the husband-petitioner owned and operated a produce proprietorship, and petitioners owned and operated a restaurant. Respondent determined substantial understatements of income, and fraud, for each of the years in issue. Petitioners assert that the apparent understatements of income are explained by a substantial cash hoard. Held: (1) Additions to tax are imposed under section 6653(b) (fraud), I.R.C. 1954, for each of the years in issue. (2) The statute of limitations does not bar assessment of the deficiencies. Sec. 6501(c)(1), I.R.C. 1954. (3) Amounts of deficiencies (and additions to tax) are determined. Victor Chini and Paul R. Shanahan, for the petitioners. Louis J. Zeller, Jr., for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income taxes and additions to tax under section 6653(b) [1] (fraud) against petitioners as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)
1967
$ 4,717.13
$ 2,358.56
1968
14,254.62
7,127.31
1969
12,236.35
6,118.18
1970
15,564.75
7,782.38
1971
[2] *668 20,434.45
10,217.22
In his amended answer, respondent asserts that the correct deficiencies in Federal individual income taxes and additions to tax under section 6653(b) (as to 1967 and 1969, see sec. 6214(a)) are as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)
1967
$ 4,737.73
$ 2,368.87
1968
11,055.07
5,527.54
1969
18,429.70
9,214.85
1970
13,456.24
6,728.12
1971
[2] 20,090.42
10,045.21
The issues for decision are as follows: (1) whether there is an underpayment of tax any part of which is due to fraud for each of the years 1967, 1968, 1969, 1970, and 1971; (2) whether the statute of limitations bars assessment of deficiencies against petitioners for 1967, 1968, 1969, or 1970; and (3) whether petitioners failed to report income in the amounts determined by respondent or in any other amounts. FINDINGS OF FACT Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated *669 herein by this reference. When the petition in this case was filed, petitioners Matthew P. Iauco (hereinafter sometimes referred to as "Matthew") and Carolyn B. Iauco (hereinafter sometimes referred to as "Carolyn"), husband and wife, resided in Liverpool, New York. Matthew is one of nine children. He has a fifth grade education. During most of Matthew's adult life he has worked in restaurants. From 1932 to 1938, Matthew was employed as a bartender at the Park Tavern restaurant, in downtown Syracuse, New York. In 1938, petitioners got married.From 1938 to 1940, Matthew was employed as a manager at the Post Grill, another restaurant in Syracuse. During 1940 and 1941, Matthew worked as a guard at the New York State Fairgrounds and also tended bar two nights a week at Luigi's, another Syracuse restaurant. In 1942, after Matthew's employment at the Fairgrounds terminated, he began working full time at Luigi's. He continued that full-time employment until sometime in 1949. From 1949 to 1955 he worked as a night manager at Tommy Del's Restaurant, near Syracuse. Each of Matthew's employers gave him a form showing the amount of income he earned and the amounts withheld for income *670 and Social Security taxes. He always gave these forms to his income tax return preparer. During the period 1942 through 1955, Matthew also operated a produce business as a sole proprietor. He would get up at 6 a.m., buy produce at a regional market and deliver it, using his own truck, to about ten or fifteen restaurants in response to their telephone orders. By 9:30 or 10 a.m., he was done for the day. When Matthew had produce left after the sales to the restaurants, he would sell it in his neighborhood. Matthew's produce business was not named, was not listed in the Syracuse telephone directory, and was not advertised in the newspapers. It was a fairly simple, daily operation, in which he used no warehouse or refrigeration equipment. Matthew operated this produce business by himself, except that for the last few years of this business petitioners' older son (hereinafter sometimes referred to as "Salvatore") helped him without pay during the summer. In the produce business, Matthew paid and received cash. However, he received and submitted invoices; these invoices were given to his tax return preparer. Matthew ceased operation of the produce business in 1955. At that time, *671 Matthew sold the truck he used in the business; the business itself was not sold. The Social Security Administration's records show earnings reported for Matthew for the years 1937 through 1955 in the amounts indicated in table 1. Table 1 Year
Amount
1937
$ 1,065.12
1938
919.00
1939
1,479.00
1940
1,763.00
1941
1,357.75
1942
1,014.25
1943
1944
1,556.62
1945
1,650.38
1946
[3] 3,059.50
1947
1,558.00
1948
[3] 3,000.00
1949
[3] 3,091.00
1950
[3] 3,000.00
1951
2,742.92
1952
2,768.25
1953
2,879.75
1954
2,729.30
1955
2,051.40
$ 37,685.24
In September 1955, Matthew leased premises and began operating his own restaurant, named Marty's Bavarian Inn (hereinafter sometimes referred to as "Bavarian"). Operation of Bavarian continued until about October 15, 1970. In December 1955, Matthew applied for a restaurant liquor license for Bavarian. Shortly afterward, Bavarian was licensed to serve beer, wine, and liquor. For a few months, Matthew operated Bavarian by himself; Carolyn then joined him, *672 then Salvatore (in 1957, Salvatore started tending bar), and then (when old enough to do so) petitioners' two younger children. During the last three years of this business, about twelve nonfamily members were employed at Bavarian. Net income before income taxes and before depreciation from the operation of Bavarian for 1955 through 1966 is indicated in table 2. Table 2 Year
Amount
1955 about
$ 5,000.00
1956 about
15,000.00
1957 about
15,000.00
1958 about
15,000.00
1959
13,830.00
1960
18,029.00
1961
17,751.95
1962
15,860.04
1963
11,686.05
1964
11,949.16
1965
20,350.77
1966
23,998.17
Total
$ 183,455.14 Matthew had a long-time objective to build his own restaurant. With this in mind, Matthew bought two adjoining parcels of land. One parcel, at 54 South Bay Road, North Syracuse, New York, was bought on October 23, 1964, for $ 25,000. Four weeks earlier, petitioners had borrowed $ 10,000 from Marine Midland Trust Company of Central New York (hereinafter sometimes referred to as "Marine Midland") to be used to buy this property. Petitioners gave Marine Midland a collateral mortgage on this property in the amount of this loan. The other parcel, at 3716 Brewerton Road, North Syracuse, New York, was bought during *673 1964 for $ 57,000. Petitioners gave the sellers a $ 35,000 fifteen-year purchase money mortgage. The balances due on the $ 35,000 mortgage on December 31 of the indicated years were as follows: 1965--$ 33,259.37, 1966--$ 31,666.98, 1967--$ 14,392.87, 1968--0. In August 1968, Matthew borrowed $ 50,000 from Lincoln National Bank and Trust Company of Central New York (hereinafter sometimes referred to as "Lincoln") for construction of a new restaurant on the two parcels of property. Lincoln made advances on this loan as construction progressed. The construction loan of $ 50,000 was paid off in November 1969. On November 13, 1969, petitioners gave Lincoln a mortgage in the amount of $ 50,000 on the new restaurant. (The $ 10,000 Marine Midland mortgage on this property was discharged, because the loan secured by the mortgage had previously been repaid.) During 1969, petitioners paid $ 75,000 to a general contractor for construction of the new restaurant, named Marty's Inn. During 1969, 1970, and 1971, petitioners paid $ 1,260.00, $ 2,683.30, and $ 483.33, respectively, for architectural services relating to construction of Marty's Inn. During 1970 and 1971, petitioners paid $ 15,693.37 *674 and $ 5,110.81, respectively, for other expenses relating to the construction of Marty's Inn. During 1971, petitioners paid $ 11,442.79 for improvements to Marty's Inn. During 1967, 1968, 1969, 1970, and 1971, petitioners paid $ 765.18, $ 947.50, $ 1,218.75, $ 30,818.51, and $ 4,140.83, respectively, for equipment for Marty's Inn. Marty's Inn opened in March 1970 and remained in operation throughout the remaining years in issue. Bavarian continued in operation until October 1970, at which time its operation was discontinued. Matthew operated both restaurants during the March-October 1970 period. Marty's Inn is a restaurant and bar with a total seating capacity of 96, which is about twice the capacity of Bavarian. The bar itself has eight or nine barstools. Food is served in the restaurant from 8 a.m. until approximately 11 p.m. and the bar remains open until approximately 1 a.m. Petitioners, their sons, and occasionally petitioners' nephew tended bar. Waiters and waitresses handled the sales and service in the dining area. Procedures of operation were generally the same for Bavarian as for Marty's Inn. The hours of both restaurants were also the same except that the bar *675 at Bavarian was open until 3 a.m. For sales of food and drink in the dining area, the waiters and waitresses would give to the bartender the guest tickets upon which the orders had been recorded and the money paid by the customer; the bartender would ring up the items on the cash register, which imprinted the amounts for food, bar, and tax on the guest ticket. Duplicates of the guest tickets that the waitresses and waiters gave to the kitchen or bar for each order were matched with the "rung up" tickets at the end of each day by petitioners' younger son after the dining room closed. After the waitresses and waiters had accounted for their guest checks, they left the restaurant. Guest tickets were not used in the bar operation.For drinks sold at the bar, the bartender merely took the money and rang up the sale on one of the cash registers located in the bar. Usually the only waitress serving at the bar during the day was Carolyn, although occasionally another waitress would take food orders from customers at the bar. Marty's Inn had three cash registers located at the back of the bar, but only two of the registers were used--one located on the left side and one located on the right *676 side of the bar. The right one was used exclusively to ring up sales at the bar; the left one was used to ring up sales from both the restaurant and bar. The third register, located in the center of the bar, was never used. A fourth register, located between the dining room and the bar, was used only on Friday nights because of the larger volume of business that night. A daily cash sheet was maintained in the operation of the restaurant. All cash purchases made during the day were recorded on the cash sheet and classified as to type of expense. Each night, Matthew or his younger son would total the cash registers and count the cash. Total sales for food and liquor would be entered on the daily cash sheet and the summary register tape (but not the tapes showing each transaction) would be stapled to the daily cash sheet. Information from the daily cash sheets was posted to ledgers. The books and records of the restaurant are a single entry system. The single entry system is a common system of record keeping for restaurants. From June 1963 through October 1973, Michael R. Wilton (hereinafter sometimes referred to as "Wilton") was a special agent employed by the Criminal Investigation *677 Division of the Internal Revenue Service in Syracuse, New York. During 1970 and 1971, Wilton was also a member of the United States Army Reserves (hereinafter sometimes referred to as "the Reserves"). As a member of the Reserves, Wilton was required to attend drills and administrative meetings, which usually were held on Thursday evenings. During 1970 and 1971, Wilton attended approximately 30 Thursday night meetings each year. Wilton and other members of the Reserves often went to Marty's Inn after these Thursday night meetings, arriving about 11:15 or 11:30 p.m. In all, Wilton went to Marty's Inn about 40 times during 1970 and 1971. Wilton generally remained at Marty's Inn until 12:50 or 1:00 a.m. On the majority of evenings he was there, Wilton observed Matthew total the right-hand register at about midnight. Thereafter, the drawer to the register was left open and cash from sales would be put in that register. In 1943, Carolyn worked as a riveter for the Prosperity Company. In 1950, she worked as a saleslady for Kempton's Luggage. For five years (1951 through 1955), she was a factory worker for Autolite for nine months of each year. The Social Security Administration's *678 records show earnings reported for Carolyn for the years 1941 through 1943 and years 1949 through 1955 in the amounts indicated in table 3. Table 3 Year
Amount
1941
1942
1943
1,083.73
1949
1950
561.88
1951
2,679.36
1952
1,619.39
1953
1,976.47
1954
1,032.83
1955
2,494.04
$ 11,447.70
From 1938 through 1956, petitioners lived with Carolyn's mother and paid rent to her of $ 20 per month. Salvatore was born in 1939 and lived with petitioners until his marriage in 1960. Petitioners' other two children were born in 1944. Their daughter lived with petitioners until 1962 and their younger son lived with petitioners until 1965. During the period 1938-1956, petitioners spent at least $ 12.50 a week on food. Additionally, Matthew used spending money of at least $ 10 a week during these years. In 1956, petitioners bought and moved into their own home. In 1966, they bought and moved into another home. During the period from 1956 through the years in issue, Carolyn was given $ 100 a week for household expenses. Beginning around 1957, petitioners bought a new Cadillac automobile every other year. They generally owned a Ford or Chevrolet automobile, as well as a Cadillac. From about 1955 on, petitioners took *679 annual one-week vacations to Miami or the Bahamas. During this time, petitioners also took annual Sunday-Wednesday vacations to Saratoga Springs, New York. On October 22, 1954, petitioners opened a joint savings account at the Syracuse Savings Bank. This account showed activity until September 9, 1955, when all but $ 1 was withdrawn. On November 24, 1964, Carolyn opened a savings account at Lincoln in her name; it was made a joint account on July 16, 1969. This account showed activity through the end of 1971. On January 23, 1969, petitioners opened another savings account at Lincoln. This account had a balance of $ 7,906.34 on December 31, 1971. On January 6, 1969, Matthew and Carolyn each opened a savings account at the Onondaga Savings Bank. Matthew's account was closed in April 1970. Carolyn's account had a balance of $ 518.54 on December 31, 1971. On May 20, 1970, Matthew opened another savings account at the Onondaga Savings Bank. This account had a balance of $ 1,424.47 on December 31, 1971. In 1967, 1968, 1970, and 1971, petitioners maintained Christmas club accounts at Syracuse Savings Bank. They generally deposited $ 10-$ 20 per week into these accounts and used *680 the funds for vacations. Petitioners maintained a business checking account for Bavarian at Marine Midland during 1966 through 1969. Petitioners maintained a business checking account for Marty's Inn at Lincoln during 1969 through 1971. Petitioners maintained a joint checking account at Marine Midland during 1966 through 1971. About 1955, petitioners rented a safe deposit box at Marine Midland. This box was given up about 1970. On December 23, 1963, petitioners rented a safe deposit box at the Syracuse National Bank. The key was not surrendered on this box until after the end of the last year in issue in the instant case. Petitioners did not put money in either of the these safe deposit boxes. Petitioners borrowed money from Marine Midland in the amounts and for the period indicated in table 4. Table 4 Date by Which
Date of Loan
Loan Repaid
Amount
September 28, 1964
March 21, 1967
$ 10,000
March 22, 1967
September 12, 1969
10,000
September 12, 1969
December 8, 1970
5,000
The $ 10,000 loan on September 28, 1964, was used to buy the property at 54 South Bay Road and the petitioners gave the trust company a collateral mortgage on the property in the amount of the loan. On September 16, 1964, *681 petitioners signed a personal financial statement in connection with a loan application to Marine Midland. This financial statement showed cash on hand of $ 5,000 and a net worth of $ 87,061. Matthew signed a personal financial statement dated October 31, 1967, in connection with another loan application made to the same bank. That statement showed cash on hand of $ 3,000 and a net worth of $ 131,000. A third loan application with the same bank dated November 30, 1969, and signed by Matthew, shows cash on hand of $ 3,000 and a net worth of $ 279,454.93. In December 1955, Matthew filed a statement of finances with the New York State Liquor Authority (hereinafter referred to as "the Liquor Authority") in connection with his application for a liquor license for Bavarian. In that statement, Matthew listed his net worth as $ 2,682.87 and total cash on hand as $ 1,350.00. Matthew told the investigator for the Liquor Authority who examined the application that he intended to finance the required investment for Bavarian of $ 7,500-$ 8,000 primarily through loans. In September 1969, Matthew filed an application with the Liquor Authority for a liquor license for Marty's Inn together *682 with a statement of finances. The statement of finances showed the applicant's net worth to be $ 43,456.35. There was no cash on hand balance indicated on the statement. The investigator for the Liquor Authority who examined Mattnew's statement of finances testified that he understood Mattnew intended to finance the required investment in Marty's Inn by cash on hand of $ 5,000, amounts in various savings accounts, loans, and credit. Petitioners did not at any time through 1971 receive an inheritance. In 1969, Matthew borrowed $ 5,000 from his brother-in-law. The loan was repaid in 1969. Other than this loan, petitioners did not borrow any money from friends or relatives during the years 1966 through 1971. Petitioners did not receive any large gifts of money during the years 1966 through 1971. In March 1972, Wayne Thomas (hereinafter sometimes referred to as "Thomas"), a revenue agent, audited petitioners' income tax returns for 1969 and 1970. All the books and records of the restaurant were made available to him. Thomas tested the accuracy of petitioner's books and records by making a net worth plus personal expenditures calculation. At that time, Thomas asked Matthew the *683 amount of cash he kept on hand, including cash on his person or in the business for making change. Matthew replied he had cash on hand of $ 2,000 and also denied having a "cash hoard". As a result of his audit, Thomas prepared a report dated March 28, 1972, to the Intelligence Division. On August 28, 1972, Ray J. Mascari (hereinafter sometimes referred to as "Mascari"), special agent, and Thomas met with Matthew and Salvatore. During this meeting, Mascari questioned Matthew about how much cash he kept on hand including any cash hoards during each of the years 1967 through 1971. Matthew replied that he had kept $ 15-20,000 in a cigar box in the restaurant to cash checks but that around 1969 he abandoned that practice and thereafter kept cash on hand of only $ 1,500-2,000. He claimed he used the cigar box money toward the construction of Marty's Inn. Thomas and Mascari returned to the restaurant on August 29, 1972. At that time, they learned that the petitioners were represented by an attorney. Mascari and Thomas informed petitioners' attorney that petitioners' returns for 1967 through 1971 were being investigated. All books and records of the restaurant business were made *684 available for Mascari and Thomas to examine. On March 5, 1973, Mascari and Thomas met with petitioners' attorney to ask certain questions about assets and liabilities entering into the net worth computation. The attorney said nothing at this meeting about petitioners' cash on hand. On August 30, 1973, Mascari and Thomas met with Mattnew and his attorneys. Mascari told Matthew and his attorneys at that time that their investigation was substantially completed and that the net worth calculation disclosed unreported income for the years 1967 through 1971 in the total amounts of about $ 198,000 for civil purposes and $ 150,000 for criminal purposes. Petitioners' attorneys were given a copy of the liability section of the net worth calculation at the meeting. During that August 30, 1973, meeting, there was no discussion of petitioners' cash on hand. Mascari first learned in February 1975 that petitioners claimed to have a substantial cash hoard. On December 31, 1966, petitioners had a net worth, excluding cash on hand, as shown in table 5. Table 5 Description
Amount
Cash in checking accounts
$ 1,407.23 Cash in savings accounts
4,479.66 Investment in Investor's Syndicate
of America, Inc.
2,396.24 Real Property: 400 Jewell Drive, Liverpool, N.Y.
27,945.00 54 South Bay Road, N. Syracuse, N.Y.
25,000.00 3716 Brewerton Road
57,000.00 Equipment
9,608.99 Vehicles
13,599.65 Deposits and other assets
50.00 Notes payable
( 1,000.00)
Mortgages payable
(39,344.62)
Other payables
( 1,427.05)
Total Net Worth
$ 99,715.10 For *685 each of the years 1967 through 1971, table 6 shows (col. 2) petitioners' taxable income, (col. 3) the taxable income petitioners reported on their Federal income tax return, and (col. 4) the amount by which petitioners understated their taxable income. Table 6 (col. 1)
(col. 2)
(col. 3)
(col. 4)
Taxable Income
Amount of
Year
Taxable Income
Reported
Understatement
1967
$ 28,420.84
$ 13,075.98 $ 15,344.86
1968
39,081.39
8,317.81 30,763.58
1969
50,324.44
4,675.24 45,649.20
1970
42,080.05
7,108.60 34,971.45
1971
53,012.53
( 8,424.60)
61,437.13
Totals
$ 212,919.25
$ 24,753.03 $ 188,166.22
For the years 1967, 1968, 1969, 1970, and 1971, respondent made technical adjustments, which involved noncash items and did not affect gross receipts, to increase (decrease) petitioners' taxable income in the amounts of $ 738.87, $ 1,725.63, $ (5,006.53), $ 19,915.24, and $ 21,157.20, respectively. Netting these amounts against table 6 (col. 4), petitioners' unreported receipts of income subject to tax for 1967 through 1971 aggregated about $ 150,000. For each of the years 1967 through 1971, there was an underpayment of Federal income taxes all or a part of which was due to fraud. Petitioners' income tax return for each of the *686 years 1967 through 1970 was false or fraudulent. OPINION I. Fraud Additions to Tax
Respondent determined that all or a part of an underpayment in income taxes for each of the years in issue was due to petitioners' fraud. Petitioners deny that there were underpayments and deny that there was fraud. We agree with respondent as to each of the years in issue. In order to sustain his determination as to the fraud addition to tax [4] for a year, respondent must prove, by clear and convincing evidence, that some part of an underpayment for that year is due to fraud. Sec. 7454(a); [5] *688 Rule 142(b), Tax Court Rules of Practice and Procedure; e.g., Stone v. Commissioner,56 T.C. 213, 220 (1971); Otsuki v. Commissioner,53 T.C. 96, 105 (1969). Respondent need not prove the precise amount of underpayment resulting from fraud, but only that there is some underpayment and that some part of it is attributable to fraud. Lee v. United States,466 F.2d 11, 16-17 (CA5 1972); Plunkett v. Commissioner,465 F.2d 299, 303 (CA7 1972), affg. a Memorandum Opinion of this Court; [6]Lowy v. Commissioner,288 F.2d 517 (CA2 1961), affg. a Memorandum Opinion of this Court; [7]Otsuki v. Commissioner,53 T.C. at 105; *687 Estate of Brame v. Commissioner,25 T.C. 824, 831-832 (1956), affd. 256 F.2d 343 (CA5 1958). The issue of fraud poses a factual question which is to be decided on an examination of all the evidence in the record. Plunkett v. Commissioner,supra;Mensik v. Commissioner,328 F.2d 147, 150 (CA7 1964), affg. 37 T.C. 703 (1962); Stone v. Commissioner,56 T.C. at 224; Stratton v. Commissioner,54 T.C. 255, 284 (1970). Fraud is an actual intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. E.g., Webb v. Commissioner,394 F.2d 366, 377 (CA5 1968), affg. a Memorandum Opinion of this Court; [8]Powell v. Granquist,252 F.2d 56, 60 (CA9 1958); Wiseley v. Commissioner,185 F.2d 263, 266 (CA6 1950), revg. 13 T.C. 253 (1949); Estate of Pittard v. Commissioner,69 T.C. 391, 400 (1977); McGee v. Commissioner,61 T.C. 249, 256-257 (1973), affd. 519 F.2d 1121 (CA5 1975). This intent may be inferred from circumstantial evidence. Powell v. Granquist,252 F.2d at 61; Gajewski v. Commissioner,67 T.C. 181, 200 (1976); Beaver v. Commissioner,55 T.C. 85, 92-93 (1970). Viewing the record as a whole, we conclude that respondent has sustained his burden of showing fraud by clear and convincing evidence for each of the years in issue. The parties agree that, if *689 the Court determines that the petitioners' cash on hand on December 31 of each of the years 1966 through 1970, was not more than $ 2,000, then the amounts of petitioners' correct taxable income for the years at issue are as set forth in column 2 of table 6, supra. Petitioners reported taxable income in the amounts set forth in column 3 of table 6, supra. Thus, if we agree with respondent as to each on hand, then there is a pattern of consistent understatements of substantial amounts of income as indicated in column 4 of table 6, supra.
Petitioners claim that they had a substantial cash hoard and that this was the source of the funds that resulted in the apparent understatements of income. Petitioners testified that this cash hoard, accumulated over the decades, amounted to $ 159,300 in July 1964, and about $ 200,000 in December 1968. This apparently is in addition to petitioners' December 31, 1966, net worth of approximately $ 100,000 (see table 5, supra). Matthew testified that, by the end of 1970, this cash hoard was reduced to about $ 30,000. Petitioners concede that they did not receive any gifts, inheritances, or loans that might be the source of large unexplained amounts *690 of cash. Instead, they explain that by working hard and living frugally they were able to accumulate their cash hoard. We do not believe that petitioners accumulated so large a cash hoard. We do not believe that their earnings and life-style would allow for such an accumulation. We do not believe they had such a fear of banks that they would keep such an accumulation at home. We do not believe petitioners' explanation of their prior statements that they had only $ 1,350 - $ 5,000 "cash on hand". We do not believe petitioners' explanation of why they borrowed money. Matthew testified to a variety of jobs and a produce business proprietorship, suggesting roughly the amounts of earnings set forth in table 7. Table 7 Year
Amount
1932
$ 3,000
1933
3,000
1934
3,000
1935
3,000
1936
3,000
1937
3,000
1938
3,000
1939
8,000
1940
8,000
1941
7,000
1942
14,000
1943
14,000
1944
14,000
1945
14,000
1946
14,000
1947
14,000
1948
14,000
1949
17,000
1950
17,000
1951
17,000
1952
17,000
1953
17,000
1954
17,000
1955
17,000
Matthew's testimony as to amounts is sharply contradicted by the Social Security Administration records summary on which table 1, supra, is based. [9] Petitioners offer no plausible explanation of the very large differences between *691 Matthew's uncorroborated testimony and the Social Security Administration records. Similar discrepancies exist between Carolyn's testimony and the Social Security Administration records summary as to her (see table 3, supra). Petitioners may have lived more frugally than others. However, they raised three children, took annual vacations, bought a new Cadillac automobile every other year, and accumulated a net worth of some $ 100,000 as of December 31, 1966 (table 6, supra). We do not believe they lived so frugally as to have accumulated the additional $ 150,000 - $ 200,000 they claim. Petitioners claim that they kept their cash hoard at home because of Matthew's fear as to the safety of bank deposits. This fear stemmed from losses suffered by Matthew's father and uncle as a result of bank failures in 1929. In order to believe petitioners' cash hoard claim, we *692 would have to believe that Matthew continued his refusal to trust banks at least until 1971. Yet, the record shows one or both petitioners opened savings accounts in 1954, 1964, 1969 (three accounts), and 1970, and Christmas club accounts in 1967, 1968, 1970, and 1971; they also maintained two business checking accounts and a joint checking account. We view skeptically petitioners' assertions that they believed a cedar chest, [10] *693 and then a cardboard box, [11] at home were safer than Federally insured savings accounts [12] or bank safe deposit boxes. [13] We note that (from 1941 onward) United States savings bonds were another alternative that, with savings accounts, could have assured protection of principal, ease of access, and some current earnings. We note that, even with the low savings account and savings bond interest rates in effect throughout most of the period of petitioners' alleged accumulation of their cash hoard, their story would require us to believe that they chose to forego thousands of dollars of interest--cumulatively, tens of thousands of dollars of interest. [14] *694 We do not believe it. On four separate occasions, from 1955 through 1969, petitioners filed written statements indicating cash on hand in amounts ranging from $ 1,350 to $ 5,000. On another occasion in 1969, Matthew indicated to a Liquor Authority investigator that he had $ 5,000 "cash on hand". Matthew did not indicate that he had been reluctant to disclose his cash hoard; he merely did not understand that the bank or Liquor Authority question applied. We do not believe that Matthew really believed that the banks' and the Liquor Authority's searching questions as to assets did not include that most liquid of assets, ready cash in the amount of petitioners' claimed cash hoard. Matthew's explanation of his borrowings from banks and others also is at least as consistent with occasional needs for cash for business or personal purposes, as it is with a desire to establish credit. Matthew borrowed both large and small sums, in some cases rolling over loans rather than repaying them when initially due. Matthew paid interest on his borrowing that he could have avoided by paying cash. One would have expected that, if his sole purpose was to establish *695 a good credit rating, then he would have banked the proceeds of the loans in order to reduce the net cost of enhancing his credit-worthiness. We note that petitioners' cash hoard story not told until after their counsel were informed that respondent's net worth calculations revealed substantial unreported income. At the time of the initial audit in March 1972, Matthew told Thomas he kept only $ 2,000 cash on hand and denied having a "cash hoard". On August 28, 1972, Matthew told Mascari he had kept $ 15-20,000 in a cigar box, but that after 1969 he kept only $ 1,500-2,000 cash on hand. Petitioners' attorney failed to tell Mascari and Thomas about petitioners' alleged cash hoard at a meeting in March 1973, and neither Matthew nor his attorneys mentioned a cash hoard at the August 30, 1973, meeting with Mascari and Thomas. It was at this August 30, 1973, meeting that petitioners were told that the net worth calculation had disclosed substantial understatements of income.It was not until February 1975, that the cash hoard defense was first asserted. In short, we believe that petitioners did not have any substantial cash hoard as a nontaxable source of their increases in net worth *696 plus expenditures. We are left, then, with repeated and unexplained omissions of income, substantial in comparison to the corresponding amounts of net income reported in the returns; they are persuasive evidence that a part of the underpayments in tax for each of the years before the Court was due to fraud.E.g., Holland v. United States,348 U.S. 121, 139 (1954); Lollis v. Commissioner,595 F.2d 1189, 1191 (CA9 1979), affg. a Memorandum Opinion of this Court; [15]Baumgardner v. Commissioner,251 F.2d 311, 322 (CA9 1957), affg. a Memorandum Opinion of this Court; [16]Otsuki v. Commissioner,53 T.C. at 108. Wilton's testimony points to a likely source of unreported income; it also illustrates the intentional, knowing nature of the underreporting. Petitioners delayed presenting a cash hoard explanation until, after numerous dealings with respondent's employees, petitioners were told the amount of the underreporting charged by respondent. This timing, when taken with the other defects in the cash hoard story, raises a strong inference that the story was an effort at post hoc planning--a cover up. Such a cover up is itself an indicium of guilt. *697 We must not find fraud simply on the basis of petitioners' failure to meet their burden of proving error in the determination of the deficiencies. E.g., Goldberg v. Commissioner,239 F.2d 316, 320 (CA5 1956), revg. a Memorandum Opinion of this Court; [17]Otsuki v. Commissioner,53 T.C. at 106; Nicholson v. Commissioner,32 B.T.A. 977, 989 (1935), affd. 90 F.2d 978 (CA8 1937). See Estate of Beck v. Commissioner,56 T.C. 297, 363 (1971).However, our finding of fraud is not based on any such failure of proof. On the basis of the record as a whole, we conclude that respondent has carried his burden of proving fraud by clear and convincing evidence. On this issue, we hold for respondent. II.Statute of Limitations
Petitioners maintain that assessment of any deficiencies for 1967, 1968, 1969, and 1970 is barred by the statute of limitations. Respondent concedes that the statute would bar assessments as to these years in the absence of fraud, but argues that the statute is not a bar because he has shown fraud. Petitioners concede that the statute is not a bar as to 1971 in any event. We agree with respondent. In order to lift the bar of the statute of limitations *698 on the assessment of a deficiency for 1967, 1968, 1969, and 1970, under section 6501(c)(1), [18] respondent must show by clear and convincing evidence that petitioners filed a "false or fraudulent return with the intent to evade tax" for that year. E.g., Estate of Hill v. Commissioner,59 T.C. 846, 856 (1973); Otsuki v. Commissioner,53 T.C. at 114. Our conclusion as to the fraud addition to tax issue results in our concluding that respondent has carried his burden of proof on the statute of limitations issue. On this issue, we hold for respondent. III. Amounts of Deficiencies
Respondent determined, in this net worth case, that petitioners had cash on hand of $ 2,000 at the start and close of each of the years in issue. Petitioners contend that they had a cash hoard of some $ 200,000 and substantial amounts of this hoard were spent during the years in issue. If we were to agree with petitioners *699 that cash on hand at the close of any year was less than it was at the start of that year, then we would conclude that petitioners' taxable income for that year is correspondingly less than the amount otherwise determined. We agree with respondent that petitioners have failed to show any such reduction in cash on hand. On the fraud issue, respondent had the burden of proof but it was not necessary for him to prove the amount of petitioners' understatement of income, or income tax deficiency. Consequently, it was not necessary for us to determine, for purposes of the fraud issue, whether petitioners had $ 2,000 cash on hand or, say, $ 5,000 or $ 10,000; nor was it necessary to determine in which years any such cash hoard was spent (or otherwise reduced). We are satisfied that petitioners' cash on hand was far short of the levels they claimed and was in an amount sufficiently small so that there was a pattern of substantial understatements of income. On the other hand, in analyzing whether petitioners underreported their taxable income for the years in issue, we first note that generally the burden of proof is on petitioners and respondent's determinations as to matters of fact *700 in the notice of deficiency are presumed to be correct. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). In the instant case, the parties have agreed to the taxable income amounts, apart from any effect flowing from a possible conclusion that net expenditures (or other reductions) were made out of a cash hoard in any of the years in issue (see table 6, col. (2), supra). If petitioners fail to show error in respondent's determinations in the notice of deficiency as to cash hoard, then the parties' above-noted agreement satisfies respondent's burden of proof as to the asserted increases in the amounts of the deficiencies and additions to tax for 1967 and 1969. The only matter remaining is whether petitioners have borne their burden of proving such error. As we indicated in part I of this opinion, supra, we do not believe petitioners' story of a substantial cash hoard. We have no persuasive evidence that petitioners made net expenditures from (or caused any reductions in) any cash they had on hand. There was some testimony about musty or moldy bills being brought into banks, but no persuasive evidence indicating that these amounts were *701 deposited, invested, or spent. Consequently, we have no basis for concluding that respondent erred on this point. Petitioners contend that their books and records were adequate and so respondent's use of the net worth method was inappropriate. They argue that the procedures for recording sales at the restaurants were adequate, that the single entry recording system was adequate, and that respondent's failure to contend that petitioners' books and records were not adequate before resorting to a net worth computation necessitates a decision for petitioners.In fact, they point to respondent's witness who testified the recordkeeping system was "all right". It may well be that petitioners' accounting system was adequate for their restaurant business and that the Government did not detect any specific false entries in the books and records. That does not make the use of the net worth plus expenditures method improper, however. Petitioners' books may be more consistent than truthful and it is respondent's position that many items of income disappeared before they had reached the recording stage. As the Supreme Court stated in Holland v. United States,348 U.S. at 132: Certainly Congress *702 never intended to make § 41 [of the Internal Revenue Code of 1939, predecessor of sec. 446] a set of blinders which prevents the Government from looking beyond the self-serving declarations in a taxpayer's books. * * * To protect the revenue from those who do not "render true accounts," the Government must be free to use all legal evidence available to it in determining whether the story told by the taxpayer's books accurately reflects his financial history. On this issue we hold for respondent. To reflect our holdings and the parties' stipulation as to the correct taxable incomes, Decision will be entered under Rule 155.
Footnotes
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the taxable years in issue.↩
2. The determined and asserted deficiencies are all in taxes under chapter 1 of the Internal Revenue Code of 1954, except for self-employment tax of $ 585 for 1971.
2. The determined and asserted deficiencies are all in taxes under chapter 1 of the Internal Revenue Code of 1954, except for self-employment tax of $ 585 for 1971.↩
3. For each of the years 1946, 1948, 1949, and 1950, the amount shown equals or exceeds the maximum Social Security wage base for that year. For each of the other years, the amount shown is less than the maximum Social Security wage base for that year.↩
4. SEC. 6653. FAILURE TO PAY TAX. (b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.
[Although the last sentence of this subsection was enacted in 1971 (sec. 2 of Pub. L. 91-679, 84 Stat. 2063), it applies to all open years under the Code (sec. 3 of Pub. L. 91-679, 84 Stat. 2064).] ↩
5. SEC. 7454. BURDEN OF PROOF IN FRAUD, FOUNDATION MANAGER, AND TRANSFEREE CASES. (a) Fraud.--In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary. [This language reflects several amendments since 1967 which have no effect on the instant case.] ↩
6. T.C. Memo. 1970-274↩. 7. T.C. Memo. 1960-32↩.
8. T.C. Memo. 1966-81↩.
9. The contradictions are diminished, but not significantly, by the facts that (1) in four of the nineteen years covered by table 1 Mattnew's reported earnings reached to at least the maximum Social Security wage base and (2) the tax on self-employment income (from Matthew's produce business) did not take effect until 1951.↩
10. Petitioners testified that they kept their cash hoard in a cedar chest, a "hope chest" that had been given to Carolyn. 11. Carolyn testified that the cedar chest had become dilapidated by the time they moved, in 1966, so they discarded the cedar chest and put the cash hoard into a cardboard box. ↩
12. Petitioners dealt with a number of banks and could have spread their accounts among them in order to mitigate the effects of limitations on Federal insurance. ↩
13. Petitioners began to rent a safe deposit box in 1955. They opened a second box, at a different bank, in 1963. They gave up their first box in 1970; they still had their second box at the end of 1971, the last of the years here in issue. ↩
14. In 1964, when petitioners claim to have counted a cash hoard of $ 159,300, the commercial bank savings account interest rate was 3 1/2 percent per year. Petitioners claim, then, that they turned their backs on more than $ 5,500 of interest for that year alone. The next year, the rate went up to 4 percent per year.Taking into account petitioners' claim to a cash hoard of $ 200,000 at the end of 1968, it would appear that, for only the five years 1964 through 1968, petitioners denied themselves some $ 35,000 of interest income on this cash hoard. The total interest foregone since 1938 would, of course, have been significantly greater.
15. T.C. Memo. 1976-15↩. 16. T.C. Memo. 1956-112↩.
17. T.C. Memo. 1954-242↩.
18. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (c) Exceptions.-- (1) False return.--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.↩